IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| **STACY HINNERS**<br>1130 Mudbrook Road<br>Huron, OH 44839<br>     *Plaintiff,*<br>   v.<br>**MICHAEL J. O'SHEA**<br>(in his official and individual capacities)<br>Hoyt Block Building, Suite 110<br>700 West Saint Clair Avenue<br>Cleveland, OH 44113<br>     *Defendant.* | Case No.<br><br>Judge |
| **VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF** | |

**NATURE OF THE ACTION**

1. Criticizing the government is a fundamental right enjoyed by every American, necessary to protect our democratic system of government.

2. But the City of Huron, through its highest-ranking officials, has adopted a policy of harassing two of its residents in retaliation for their criticisms. That policy began with attempts to interfere with their exercise of their religion and culminated in the arrest of Plaintiff Stacy Hinners for speaking at a City Council meeting.[1] That City's campaign of harassment was in retaliation for Mrs. Hinners engaging in a wide variety of First Amendment–protected activity, including spoken criticism, written criticism, assembly, petitioning the government, and exercise of her religion, ("Protected Activity").

---

[1] The State produced an audio recording of the full meeting in discovery, as well as several videos showing parts of the meeting, but there are no known videos of the full meeting. Those recordings are being manually filed as Exs. A-1, A-2, A-3, A-4, A-5, and A-6. A compilation of footage available from various sources is being manually filed as Ex. A-7.

3.      After that arrest, Aimee Lane, the City's director of law and a key participant in the decision to pursue charges against Mrs. Hinners, contracted Defendant Michael O'Shea, a personal-injury and DUI-defense attorney, to act as an assistant prosecutor. She acknowledged that a conflict of interest barred her from participating in the prosecution, but she continued to direct and advise O'Shea's handling of the case in an effort to limit the civil liability to which she and other city officials were exposed.

4.      During the prosecution, Defendant O'Shea became aware that the charges against Mrs. Hinners were purely political and that Mrs. Hinners was being selectively prosecuted in retaliation for her exercise of her First Amendment rights.[2] Despite this knowledge, he continued to press for a conviction, temporarily acquiescing only minutes before a hearing where he would have been required to explain why Mrs. Hinners was the first and only person ever to have been charged with violating the city's "disturbing a lawful meeting" ordinance.

5.      Even in dismissing the charges, Defendant O'Shea insisted on a dismissal *without* prejudice, explicitly holding out the threat of refiling charges against Mrs. Hinners.

6.      The harassment and prosecution of Mrs. Hinners has seriously chilled her exercise of her First Amendment rights. Formerly an active participant in public debates over all manner of local issues, Mrs. Hinners has not written or spoken publicly about any matters relating to City business since she was charged. Only this Court's intervention can put an end to the City's efforts to silence its critics by threatening them with criminal prosecution.

---

[2] *See* Exs. B-15, B-16, and B-17 (compiling instances of guests at City Council meetings engaging in conduct identical to that for which Mrs. Hinners was prosecuted, e.g., speaking without approaching the podium, directly addressing the audience, and exceeding the three– or five-minute limit).

**PARTIES**

7.     Plaintiff Stacy Hinners is a resident of Erie County, Ohio. She is a licensed attorney actively

engaged in oversight of the local government in the City of Huron, where she lives.

8.     Defendant Michael O'Shea is a resident of Cuyahoga County and the principal of the Lipson

O'Shea Legal Group in Cleveland. Director Lane contracted Defendant O'Shea to serve as an

assistant prosecutor for the purpose of convicting Mrs. Hinners of various offenses in connection

with a speech she gave at a meeting of Huron City Council.

**JURISDICTION AND VENUE**

9.     Under 28 U.S.C. §§ 1331, 1343, and 2201, this Court has jurisdiction over Mrs. Hinners's

federal claims under 42 U.S.C. §§ 1983, 1985, and 1988, which provide for attorneys' fees in civil-

rights claims. The Court has supplemental jurisdiction over her state-law claims under 28 U.S.C.

§ 1367.[3]

10.     This Court has personal jurisdiction over Defendant, who resides in and conducts business

in Cuyahoga County.

11.     Venue is proper under 28 U.S.C. § 1391 because the events giving rise to these claims took

place within this District.

---

[3] This case is not a candidate for *Younger* abstention. *Younger v. Harris*, 401 U.S. 37 (1971), held that
the possibility that a law is facially unconstitutional does not normally justify an injunction against a
pending prosecution. Here, there is only an *as applied* challenge to a prosecution that is threatened,
but not yet pending. And *Younger* carved out exceptions for cases—like this one—that challenge
laws that are "vague or overly broad as construed and applied to a particular defendant in a
particular case," *Id.* at 48, as well as for cases that are "brought in bad faith," *Id.* at 49, "only one of a
series of repeated prosecutions," *Id.* at 49, "not made with any expectation of securing valid
convictions," *Id.* at 48, brought "to harass appellants," *Id.* at 48, or brought against defendants to
"discourage them and their supporters from asserting and attempting to vindicate the constitutional
rights," *Id.* at 48.

## FACTUAL BACKGROUND

12.     For the past two years, the residents of Huron have been particularly engaged in local affairs, voicing their frustration with Huron City Council over its failure to conduct its business in a transparent manner—and the host resulting problems, including light pollution,[4] deadly conditions at a mobile home park,[5] and a marijuana dispensary setting up shop near an elementary school.[6]

13.     City Council meetings are regularly packed with so many irate citizens that the City has to open up overflow seating. At least once, the City had to move a meeting to a high-school auditorium to accommodate the audience.[7]

14.     Stacy Hinners and her husband Jason Hinners are among those citizens concerned about how Council is managing local affairs, and they have committed to making the public more informed about the business of their government.

15.     To that end, Mr. and Mrs. Hinners began regularly publishing news and commentary to a web page called "The Talk of Huron" about developments at City Hall and other news related to issues of public concern, including regular updates and commentary about City Council's activities.[8] Her readers are highly engaged. For instance:

    a.      On August 30, 2017, Mrs. Hinners published commentary about the Ohio

            Environmental Protection Agency approving the sale of lakefront property where ConAgra

---

[4] Andy Ouriel, *Mucci can't expand until light problem gets fixed*, Sandusky Register (Jan. 20, 2019), http://www.sanduskyregister.com/story/201901200003 [perma.cc/Z7WW-H4DN] (attached as Ex. F).

[5] Andy Ouriel, *Huron begins process to clean up Oster's*, Sandusky Register (Jul. 2, 2019), http://www.sanduskyregister.com/story/201907010034 [perma.cc/2SXJ-NUMP] (attached as Ex. G).

[6] Andy Ouriel, *Huron's medical marijuana company sues city, state*, Sandusky Register (Oct. 19, 2018), http://www.sanduskyregister.com/story/201810180037 [perma.cc/L5YB-EFCH] (attached as Ex. H).

[7] Andy Ouriel, *Huron moves medical marijuana meeting to McCormick*, Sandusky Register (January 17, 2018), http://www.sanduskyregister.com/story/201801160039 [perma.cc/UE2L-8W7B] (attached as Ex. I).

[8] Hinners "Talk of Huron" posts (attached as Ex. B-20).

previously operated a grain elevator ("the ConAgra site"). Her post attracted 96 comments and was shared with the social networks of 12 more people.[9]

b.        On November 30, 2017, Mrs. Hinners published news and commentary about the Ohio Department of Commerce approving OPC Cultivation LLC to operate as a marijuana cultivator in Huron. Her post attracted 611 comments and was shared with the social networks of 23 more people.[10]

c.        On February 27, 2018, Mrs. Hinners published coverage of that night's Council meeting, noting the approval of a resolution to prevent any marijuana dispensary from moving within 1,000 feet of any school in the City. Her post attracted 404 comments and was shared with the social networks of 5 more people.[11]

d.        On May 5, 2018, Mrs. Hinners published records and commentary about the City using taxpayer funds to defend OPC Cultivation from public criticism, and about the failure of the institutional press to scrutinize Council's interactions with OPC. Her post attracted 152 comments and was shared with the social networks of 3 more people.[12]

e.        On October 9, 2018, Mrs. Hinners published analysis of that night's City Council meeting, applauding Mayor Hartung and City Council for taking steps to prevent OPC Cultivation from opening a dispensary near Woodlands Elementary School. Her post attracted 191 comments.[13]

f.        After the December 11, 2018, meeting, Mrs. Hinners published documents and commentary about the City's plan to accept only two dollars in exchange for three acres of

---

[9] *Id.* at 1.

[10] *Id.* at 14.

[11] *Id.* at 66.

[12] *Id.* at 104.

[13] *Id.* at 122.

government land and a commitment to invest more than $1.5 million in taxpayer dollars in infrastructure. Her post attracted 152 comments.[14]

      g.      On December 17, 2018, Mrs. Hinners published coverage of an upcoming meeting of Council's Economic Development Committee, notifying the public that it would be meeting that evening to consider plans for the ConAgra site, and encouraging them to show up and voice their opinions. After that meeting, Mrs. Hinners followed up by publishing records and additional commentary. Her post attracted 108 comments.[15]

16.     Under the Free Speech Clause and Free Press Clause, Mrs. Hinners's posts to The Talk of Huron are First Amendment–protected activity.

17.     To promote more transparent government and educate his son on his civic obligations, Jason Hinners began regularly attending and speaking at City Council meetings with his son, and he began using the Ohio Public Records Act[16] to educate himself and his neighbors about what was motivating Council's pursuit of policies that so many people seemed to oppose.

18.     Under the Free Speech Clause and the Assembly Clause, Mr. Hinners's attendance at City Council meetings is First Amendment–protected activity.

19.     Under the Free Speech Clause and the Petition Clause, Mr. Hinners's requests for public records were First Amendment–protected activity.

20.     When the City refused to turn over records of Council's communications, Mr. Hinners sued for access—and won.[17]

---

[14] *Id.* at 146.

[15] *Id.* at 169.

[16] Ohio Rev. Code § 149.43.

[17] *Hinners v. City of Huron*, No. 2018-00549, 2018 WL 4560012 (Ohio Ct. Cl. Sep. 11, 2018).

21.     Later that year, Mr. Hinners was gathering information about payments that City Council had secretly approved for City Manager Andrew White. Again, the City refused to turn those records over. Again, Mr. Hinners sued. Almost immediately after, the City turned over the records.

22.     Under the Free Speech Clause and the Petition Clause, Mr. Hinners's lawsuits are First Amendment–protected activity.

**A Council member opens the City's campaign of retaliation.**

23.     Through their public-records requests, Mr. and Mrs. Hinners learned that City Council had met behind closed doors to approve secret payments to City Manager Andrew White. Mr. and Mrs. Hinners sent a letter to the City on April 8, 2019, explaining that the payments violated the Open Meetings Act and requesting that the City recoup them.

24.     Shortly after receiving that letter, Huron City Council and its appointed officials formed a plan to intimidate Mr. and Mrs. Hinners in retaliation for engaging in First Amendment–protected activity, including their criticism of city officials, their public-records lawsuits, and their open-meetings lawsuit.

25.     Soon after, Councilman Glen Ginesi approached Father Jeffrey McBeth, the pastor of St. Peter's Catholic Church, where both he and the Hinners family attend weekly Mass, and where Jason Hinners is training to become a member of the clergy.[18]

26.     Mr. Ginesi was on his way to a city council meeting and asked Father McBeth for time to talk about Mr. Hinners. He told Father McBeth that "as a member of council," he felt attacked by Mr. Hinners "causing problems" at City Council meetings and criticizing the government.[19] Mr.

---

[18] McBeth Aff., ¶ 4 (attached as Ex. J).
[19] *Id.* at ¶ 5 (attached as Ex. J).

Ginesi complained to Father McBeth that by criticizing City Council, Mr. Hinners was acting in a "non-Christian" way.[20]

27.     Contrary to Mr. Ginesi's complaints, the Catholic Church calls on its members to speak out against injustice wherever they see it.[21]

28.     Under the Establishment Clause and the Free Speech Clause, the Catholic Church's and Mr. Hinners's judgments and teachings as to what behavior is "Christian" or "non-Christian" are First Amendment–protected activity.

29.     Under the Free Exercise Clause, the Free Speech Clause, and the Assembly Clause, the Hinnerses' involvement at their church and their practice of their religion consistent with their sincerely held beliefs is First Amendment–protected activity.

30.     Mr. Ginesi told Father McBeth that he was "bewildered" to learn Mr. Hinners was under consideration for the diaconate or any prominent leadership role within the Church.[22]

31.     Mr. Ginesi asked Father McBeth to relay his complaints to Mr. Hinners. He directed Father McBeth to "tell him you heard it from me."[23]

### Mrs. Hinners files suit to address the culture of secrecy among Huron City Council. Mayor Hartung retaliates immediately.

32.     Before Father McBeth reported this to Mr. Hinners, Mr. and Mrs. Hinners filed another lawsuit against the City.

33.     Through their digging, they had discovered that Council had repeatedly held clandestine meetings to approve thousands of dollars in secret payments to City Manager Andrew White.

---

[20] *Id.* at ¶ 6 (attached as Ex. J).

[21] *Id.* at ¶ 9 (attached as Ex. J).

[22] *Id.* at ¶ 6 (attached as Ex. J).

[23] *Id.* at ¶ 7 (attached as Ex. J).

34.     Mr. and Mrs. Hinners repeatedly reached out to City leaders to encourage them to reverse those payments and commit to complying with their obligations to conduct public business in public.

35.     The City refused.

36.     Mrs. Hinners filed an Open Meetings Act[24] lawsuit on May 13, 2019, to nullify those payments.[25]

37.     The following evening, Mrs. Hinners attended a regular meeting of Huron City Council.

38.     During a portion of the meeting reserved for comments from the public, Mrs. Hinners rose from her seat to speak.[26]

39.     Mayor Hartung told Mrs. Hinners to speak from the podium instead.[27]

40.     Council routinely permits people to speak during the public-comment period without approaching the podium. From January 9, 2018, through May 22, 2018, Council had permitted people to speak without approaching the podium at least 12 times. None of those people were speaking about secret payments to Mr. White, and none of them were cut off, ejected from the meeting, arrested, or prosecuted for their speeches.

41.     Mrs. Hinners went to the lectern and restarted her speech.[28] Because the room's microphones did not work, she turned to face the audience, ensuring that everyone present could hear her.

42.     Mayor Hartung and Director Lane believed that Mrs. Hinners was turning her back to Mayor Hartung to communicate a lack of respect for him or for City Council. They believed the

---

[24] Ohio Rev. Code § 121.22.

[25] Complaint, *Hinners v. Huron*, 2019 CV 0275 (Erie C.P.) (attached as Ex. B-1).

[26] Meeting video compilation at 0:11 (manually filed as Ex. A-7).

[27] *Id.* at 0:15.

[28] *Id.* at 0:32.

audience understood Mrs. Hinners was indicating that lack of respect by turning her back to Mayor Hartung.

43.    Mrs. Hinners discussed several controversial decisions Council had made over the last two years. Whether they were good decisions or not, she said, "the community had a right to know about them and weigh in on them."[29]

44.    Seconds into the speech, Mayor Hartung began trying to summon police to arrest Mrs. Hinners. He repeatedly hit a panic button to get their attention.

45.    When the police did not immediately arrive, Mayor Hartung left the meeting and walked to the police department. Unable to find an officer there, Mayor Hartung returned to the meeting.

46.    One witness said the mayor was "visibly upset."[30] Watching how Mayor Hartung's "face got red," a first-time visitor to City Council was "flabbergasted" at how "angry and irate" he was.[31] She pulled out her camera because she could tell "something was amiss."[32]

47.    She was right. Mayor Hartung approached Director Lane. Pointing at Mrs. Hinners, he told Defendant Lane, "I want to have her charged."

48.    On information and belief, Director Lane approved or endorsed the decision to charge Mrs. Hinners for her speech.

49.    Sitting next to Lane and listening to the conversation, City Manager Andy White texted Chief of Police Robert Lippert, saying Hartung was "ignited" and "wants her arrested."[33]

50.    On information and belief, Chief Lippert sent a text message to Officer Mark Orzech instructing him to remove Mrs. Hinners from the meeting. Contrary to the City's records-retention

---

[29] *Id.* at 1:10.
[30] Tapp statement, 2 (attached as Ex. C-2).
[31] Jones statement, ¶ 4–5 (attached as Ex. C-3).
[32] *Id.* at ¶ 5.
[33] Text messages from White to Lippert (attached as Ex. B-2).

schedule and contrary to their ordinary practice, Chief Lippert and Officer Orzech deleted their text messages from that day.

51.     Two minutes and 53 seconds into her speech, Mrs. Hinners first announced to her neighbors at the meeting her discovery that Council had made secret payments to Mr. White.

52.     When she made that announcement, Vice Mayor Trey Hardy immediately cut her off, telling her that her three minutes were already expired.[34]

53.     Council routinely permits people to speak beyond the announced time limits for speakers in the public-comment period. From January 23, 2018, through February 12, 2019, Council had permitted people to exceed the stated time limit at least 34 times. None of those people were speaking about secret payments to Mr. White, and none of them were cut off, ejected from the meeting, arrested, or prosecuted for their speeches.

54.     Mrs. Hinners requested that she be extended Council's routine courtesy of an additional moment to conclude her remarks, but Mayor Hartung notified her that he had decided to have her charged with a crime.

55.     Mrs. Hinners noted for the record the discrepancy between how she was being treated and how other citizens had been treated, and then she returned to her seat.

56.     Mrs. Hinners sat down less than 50 seconds after Mr. Hardy called time.[35]

57.     Under the Free Speech Clause and the Petition Clause, Mrs. Hinners's speech was First Amendment–protected activity.

58.     Neither Council nor Mayor Hartung ever ruled that Mrs. Hinners was out of order.

59.     Neither Council nor Mayor Hartung ever ordered Mrs. Hinners to leave the meeting.

60.     Neither Council nor Mayor Hartung ever suspended or recessed the meeting.

---

[34] Meeting video compilation at 3:20 (manually filed as Ex. A-7).
[35] *Id.* at 4:17.

61.     After Mrs. Hinners noted that she was being singled out, Mayor Hartung offered his first justification for charging Mrs. Hinners: "You're making a mockery of the city council meeting by turning and talking."

62.     Although doing so would be protected speech under the First Amendment, Mrs. Hinners was not making a mockery of the meeting.

63.     After Mrs. Hinners sat down, the meeting continued without interruption for about five minutes as two other citizens spoke during the public-comment session.

64.     While Mrs. Hinners was sitting quietly and listening to other citizens speak, Officer Orzech and Officer Kevin Koehler arrived.[36] They stood behind the audience and observed nothing more than a routine meeting.[37]

65.     Mayor Hartung walked out of the meeting and directed the police officers to seize Mrs. Hinners.[38] He believed that if he did not remove Mrs. Hinners from the meeting, she would continue to criticize him and Council, either during the meeting or immediately after.

66.     The police entered Council chambers and asked Mrs. Hinners if she would speak to them outside.[39]Mrs. Hinners wanted to continue observing the public meeting, so she declined.[40] Mayor Hartung then ordered the police to remove Mrs. Hinners.[41]

67.     After giving that order, Mayor Hartung shifted to a second justification for charging Mrs. Hinners, saying it was because she didn't "get up … like everyone else does" to make her speech, when she was required to "stand up and … do it."

---

[36] *Id.* at 8:48.

[37] *Id.* at 8:48.

[38] *Id.* at 9:02.

[39] *Id.* at 9:17.

[40] *Id.* at 9:47.

[41] *Id.* at 9:53.

68.     Council routinely permits people to speak from their seats during City Council meetings. None of those people were speaking about secret payments to Mr. White, and none of them were cut off, ejected from the meeting, arrested, or prosecuted for their speeches.

69.     Although the First Amendment would have permitted her to remain seated during her speech, Mrs. Hinners did "get up" to make her speech.

70.     Mayor Hartung then shifted to a third justification, suggesting the charges were because Mrs. Hinners was "grandstand[ing]."

71.     Council routinely permits speakers to grandstand during the public-comment period. None of those people were speaking about secret payments to Mr. White, and none of them were cut off, ejected from the meeting, arrested, or prosecuted for their speeches.

72.     Although the First Amendment would have permitted her to do so, Mrs. Hinners did not grandstand.

73.     Mayor Hartung then shifted to a fourth justification, suggesting the charges were because Mrs. Hinners had turned around during her speech.

74.     Council routinely permits speakers to turn around during the public-comment period. From January 23, 2018, through January 8, 2019, Council had permitted "turning and talking" by speakers at least 12 times. None of those people were speaking about secret payments to Mr. White, and none of them were cut off, ejected from the meeting, arrested, or prosecuted for their speeches.

75.     The First Amendment permitted Mrs. Hinners to turn around during her speech.

76.     The officers followed the mayor's orders. They grabbed Mrs. Hinners by the arms, pulled her out of the chair where she was sitting next to her son, threw her against a wall, handcuffed her, and marched her from Council chambers.[42]

---

[42] *Id.* at 10:23.

77.     The next day, Mayor Hartung shifted to a fifth justification for having Mrs. Hinners charged. He told the Sandusky Register that Mrs. Hinners was being prosecuted because "she chose to ignore the rules" for the public-comment portion of its meetings.[43]

78.     City Council does not have rules for the public-comment portion of its meetings.

**City officials dust off a never-before-used ordinance to prosecute Mrs. Hinners; the citizens call shenanigans.**

79.     The police held Mrs. Hinners in a booking room for nearly half an hour before issuing her a complaint charging her with disturbing a lawful meeting in violation of Huron Codified Ordinance § 509.04.[44]

80.     The Huron Police Department has not classified any incident as a violation of H.C.O. § 509.04 in at least 10 years before it filed charges against Mrs. Hinners.[45] Besides Mrs. Hinners, no one has been charged with violating H.C.O. § 509.04 in the 20-plus years since the City began keeping electronic court records.[46] On information and belief, no one other than Mrs. Hinners has *ever* been charged under that ordinance.

81.     The people of Huron—who know Mayor Hartung and how much latitude he usually allows speakers at Council meetings—immediately recognized the games he was playing. After being dragged in the press and social media, Mayor Hartung was nowhere to be found for the next council meeting, where citizens packed the house to demand that the City stop the retaliation. Speakers at the meeting called reminded Council about the importance of the work Mr. and Mrs. Hinners do to keep the community informed and called out the nakedly political motivation for pursuing charges:[47]

---

[43] Andy Ouriel, *Huron mayor defends decision to remove resident from council meeting*, Sandusky Register (May 15, 2019), http://www.sanduskyregister.com/story/201905150006 (attached as Ex. K).

[44] Complaint, *State v. Hinners*, No. 19-CRB-126BC, Huron Muni. Ct. (May 14, 2019) (attached as Ex. D-1).

[45] Lippert e-mail to Bardwell, 5 (Oct. 7, 2019) (attached as Ex. D-46).

[46] Ortega e-mail to Gillombardo (attached as Ex. E-2).

[47] Minutes of May 28, 2019 meeting, 1–3 (attached as Ex. D-42).

a. Monty Tapp called council's actions "an embarrassment."

b. Cheryl Zimmerman said Mr. and Mrs. Hinners "should have been thanked by Council for their research and advice."

c. Maria Fry objected to Council's handling of various issues and to the fact that "Ms. Hinners was targeted for bringing some of these issues to light."

d. Mary Murphy objected to Council filing charges now based on guidelines that have "not been universally enforced."

e. Pamela Snell said "the constitutional rights of Ms. Hinners were violated … due to her pursuit for the truth, criticism of the process, and lack of transparency on several topics which she brought to light."

f. Meredith Miller said "the actions taken were done to embarrass Ms. Hinners and infringed her freedom of speech."

g. Steve Fisher said the arrest was "an overreaction and a setup," noting that "inconsistent rules have been applied."

h. Christy Jones was "appalled at the actions of council and the treatment of Ms. Hinners."

i. Tony Legando said it was clear Mrs. Hinners was being prosecuted "due to the content of her message."

j. Mark Claus noted that he had "never seen the 3 minute time limit strictly enforced" and that "the action taken was retaliatory due to the content of the comments made by Ms. Hinners."

82. Mrs. Hinners had not violated H.C.O. § 509.04. There was no probable cause to believe Mrs. Hinners had violated H.C.O. § 509.04.

83.    Citizens routinely engage in the same behavior that Mrs. Hinners engaged in at the May 14 meeting.

84.    For instance, audience members who give speeches about topics other than Council making secret, backroom payments to Mr. White regularly speak from somewhere other than lectern without being arrested. They include the following:

    a.    Beth Fisher at the January 9, 2018, meeting;

    b.    Gina Woody at the January 9, 2018, meeting;

    c.    Gordon Hahn twice, at the January 9, 2018, meeting;

    d.    Steve Fisher at the January 9, 2018, meeting;

    e.    Sandy Legando three times, at the January 9, 2018, meeting;

    f.    Steve Fisher at the January 23, 2018, meeting;

    g.    Tony Legando at the April 24, 2018, meeting;

    h.    Robert Forney Jr. at the April 24, 2018, meeting; and

    i.    Phyllis Wassner at the May 22, 2018, meeting.

85.    Similarly, many audience members regularly turn to face the audience without being arrested when they address topics other than Council making secret payments to Mr. White. They include:

    a.    Paul Hanny at the January 23, 2018, meeting;

    b.    Steve Fisher at the January 23, 2018, meeting;

    c.    Kyle Orten at the January 23, 2018, meeting;

    d.    Shannon Pollack at the February 27, 2018, meeting;

    e.    Glen Szatala at the April 24, 2018, meeting;

    f.    Beth Fisher at the April 24, 2018, meeting;

    g.    Gina Woody at the April 24, 2018, meeting;

    h.    Tony Legando at the April 24, 2018, meeting;

   i. Shannon Pollack at the May 22, 2018, meeting;

   j. Rebekah Cupp at the January 8, 2019, meeting;

   k. Mary Kay Schlessman at the January 8, 2019, meeting; and

   l. Sandy Legando at the January 8, 2019, meeting.

86. And speakers are regularly allowed to exceed the supposed three-minute limit on speeches without being arrested when they give speeches about topics other than Council making secret payments to Mr. White. They include:

   a. Kyle Orten at the January 23, 2018, meeting;

   b. Tony Legando at the January 23, 2018, meeting;

   c. Pete Schade at the January 23, 2018, meeting;

   d. Beth Fisher at the January 23, 2018, meeting;

   e. Bill Scott at the February 27, 2018, meeting;

   f. Stacy Hinners at the February 27, 2018, meeting (not talking about secret payments to Mr. White);

   g. Steve Fisher at the February 27, 2018, meeting;

   h. Shannon Pollack at the February 27, 2018, meeting;

   i. Julie Spitzley at the April 24, 2018, meeting;

   j. Glen Szatala at the April 24, 2018, meeting;

   k. Gina Woody at the April 24, 2018, meeting;

   l. Tony Legando at the May 22, 2018, meeting;

   m. Steve Fisher at the May 22, 2018, meeting;

   n. Lori Legando at the May 22, 2018, meeting;

   o. Bob Howell at the May 22, 2018, meeting;

   p. Robert Smith at the May 22, 2018, meeting;

q.   Shannon Pollack at the May 22, 2018, meeting;

r.   Beth Fisher at the May 22, 2018, meeting;

s.   Dr. Brian Murphy at the May 22, 2018, meeting;

t.   Shannon Pollack at the October 9, 2018, meeting;

u.   Jason Hinners at the November 27, 2018, meeting;

v.   Cathy Ramey at the November 27, 2018, meeting;

w.  Scott Schlessman at the November 27, 2018, meeting;

x.   Shawn Buckley at the December 11, 2018, meeting;

y.   Jason Hinners at the December 20, 2018, meeting;

z.   Mac Lehrer at the December 20, 2018, meeting;

aa.  Bob Howell at the December 20, 2018, meeting;

bb.  Lori Suter at the January 8, 2019, meeting;

cc.  Shaun Bickley, twice, at the January 8, 2019, meeting;

dd.  Rebekah Cupp at the January 8, 2019, meeting;

ee.  Scott Schlessman at the January 8, 2019, meeting;

ff.  Sandy Legando at the January 8, 2019, meeting;

gg.  John Zimmerman at the February 12, 2019, meeting;

hh.  Chuck Allendorf at the February 12, 2019, meeting; and

ii.   Joe Catri at the February 12, 2019, meeting.

87.   Other people similarly situated to Mrs. Hinners have not generally been prosecuted because of the conduct forming the basis of the charge against her.

88.   The City prosecuted Mrs. Hinners because she exercised her First Amendment rights to criticize City Council's secret payments and to petition the government for redress of that grievance.

89.     After learning that Mrs. Hinners had retained a defense attorney, police filed a new charge of resisting arrest (H.C.O. § 525.09) against Mrs. Hinners.[48]

90.     Mrs. Hinners hadn't been arrested. She had not and could not have violated H.C.O. § 525.09.

91.     There was no probable cause to believe Mrs. Hinners had violated H.C.O. § 525.09.

**Defendant Lane acknowledges a conflict keeps her from handling the Hinners matter; she seizes control anyway.**

92.     Director Lane has no apparent contractual responsibility for or authority over prosecution decisions. Under her firm's contract with the City, she is to provide "routine services," which are limited to attending meetings, drafting and reviewing documents, and providing legal research and advice.[49] The contract specifies that litigation is "outside the scope" of the firm's routine services and requires a special agreement.[50]

93.     On information and belief, there was no agreement made to give Defendant Lane authority over the prosecution of Mrs. Hinners or anyone at all.

94.     The decision whether to proceed with the charges against Mrs. Hinners properly remained with Prosecutor Michael Kaufman, who handles all criminal matters in the Huron Municipal Court. The City was clear when entering into its contract with Walter Haverfield that "Mr. Kaufman would remain Prosecutor for the city."[51]

95.     Director Lane recognized that her role as a witness in the Hinners case presented a conflict of interest that required her to withdraw from any involvement in the handling of the case.

---

[48] Second complaint, *State v. Hinners*, No. 19-CRB-126BC, Huron Muni. Ct. (May 16, 2019) (attached as Ex. D-2).
[49] City of Huron–Walter Haverfield engagement agreement (Apr. 11, 2019) (attached as Ex. D-36).
[50] *Id.*
[51] Minutes of April 9, 2019 meeting, 2 (attached as Ex. D-35).

96.     Director Lane recognized that her exposure to civil and criminal liability as a result of Mrs. Hinners's arrest presented a conflict of interest that required her to withdraw from any involvement in the handling of the case. Lane nonetheless attempted to assert control over the case.

97.     Lane purported to recuse herself from involvement, notifying defense counsel that she was "preparing a motion to file with the court to have a special prosecutor appointed for this case."[52] On information and belief, Lane directed Mr. Kaufman to recuse himself, as well, on the theory that he reported to a conflicted attorney.

98.     Mr. Kaufman did withdraw from the case.

99.     But Lane did not file a motion to have the court select and appoint an independent special prosecutor.

100.    Instead, she personally shopped around for an assistant prosecutor who would prosecute Mrs. Hinners for her.

101.    Director Lane first hired Wayne Nicol.[53] But Nicol, the City of Vermilion's prosecutor, has close ties with Lane's firm, Walter Haverfield, where his Vermillion *co-prosecutor*,[54] Sara Fagnilli, is an associate.[55] He also works day-in-day-out with Chris Hartung, Vermillion's police chief[56] and the brother of former Mayor Hartung.

102.    On information and belief, Lane arranged the termination of her contract with Mr. Nicol immediately after the press caught on to the obvious conflicts.

103.    Lane began looking for a new assistant to obtain a conviction against Mrs. Hinners. On May 23, 2019, she hired Defendant O'Shea, a personal-injury and DUI-defense attorney who also works

---

[52] Lane e-mail to Chandra (May 17, 2019) (attached as Ex. D-21).
[53] Lane letter to Ortega (May 21, 2019), (attached as Ex. D-22).
[54] Vermilion Municipal Court information (attached as Ex. D-30).
[55] Sara Fagnilli profile (attached as Ex. D-31).
[56] Vermilion Police Department information (attached as Ex. D-32).

part-time for the City of Rocky River, which has also contracted with Walter Haverfield for legal services.

104.    Lane offered to pay him $150 an hour to prosecute Mrs. Hinners. Again, she said the delegation was "made pursuant to R.C. 2938.13."[57] Despite Ms. Lane's May 17 email stating that she would apply to the Court for an appointment, she again did not do so. Under the delegation, the O'Shea submits bills for his services to Walter Haverfield, not to the City.[58]

105.    Despite her conflict, Director Lane retained authority to approve and pay Defendant O'Shea's fees and expenses. On information and belief, she also continued overseeing Defendant O'Shea's handling of the case, including in discussions of filings in the case, case strategy, and possible plea bargains.[59]

106.    On information and belief, beginning July 1, Defendant O'Shea began coordinating directly with the City's civil-defense firm, as well.

### Lane continues to interfere with the City's handling of the case; Council ratifies Mayor Hartung's order to prosecute Mrs. Hinners.

107.    At the July 9, 2019, meeting of Huron City Council, Council member Sam Artino proposed that City Council, as the "victim" of Mrs. Hinners's purported crime, pass a resolution declining to press charges against her or asking Defendant O'Shea to drop the charges.[60]

108.    Mr. Artino then formally made a motion for Council to seek an end to the charges against Mrs. Hinners.

109.    Another member seconded that motion.[61]

---

[57] Lane letter to Ortega (May 23, 2019) (attached as Ex. D-3).

[58] *See* Lipson O'Shea invoice to "City of Huron, c/o Walter Haverfield" (Jul. 1, 2019) (attached as Ex. D-44).

[59] *See id.* at 2 (reflecting 0.3 hours for "Email correspondence with Aimee W. Lane . . . and TC re witness issue." and another 0.1 hours for "Email correspondence with [Aimee Lane]").

[60] Minutes of July 9, 2019 meeting, 6–7 (attached as Ex. D-45).

[61] *Id.*

110.     Despite her conflict, Lane interjected herself into the discussion. She sought to dissuade Council from approving such a motion. She told Council it would have no effect and intimated that it could be illegal.

111.     On Lane's advice, Council declined to discontinue the prosecution of Mrs. Hinners.[62]

112.     Council's vote ratified the decision to prosecute Mrs. Hinners, reconfirming it as the City's official policy.

### Defendant O'Shea wields his prosecutorial power to protect his conflicted employer instead of administering justice.

113.     On July 3, 2019, Defendant O'Shea wrote to Mrs. Hinners's attorneys. He conceded that there was no probable cause to support charging Mrs. Hinners with resisting arrest "because she was not being arrested."[63]

114.     Defendant O'Shea offered to abandon the entire criminal prosecution if Mrs. Hinners would stipulate that her arrest was supported by probable cause. If she refused, he threatened to add a new charge of obstructing official business (H.C.O. § 525.07) and take the case to trial.[64]

115.     Seeking a stipulation regarding probable cause served no legitimate prosecutorial purpose.

116.     O'Shea's demand for the stipulation was intended solely to protect Lane and other City officials from liability.

117.     Mrs. Hinners declined to make the false stipulation Defendant O'Shea demanded. O'Shea followed through on his threat to charge Mrs. Hinners under H.C.O. § 525.07.[65]

118.     Mrs. Hinners had not violated H.C.O. § 525.07. There was no probable cause to believe Mrs. Hinners had violated H.C.O. § 525.07.

---

[62] *Id.*

[63] O'Shea e-mail to Chandra (July 3, 2019) (attached as Ex. D-42).

[64] *Id.*

[65] Third complaint, *State v. Hinners*, No. 19-CRB-126BC, Huron Muni. Ct. (July 23, 2019) (attached as Ex. D-6).

119.     Citizens frequently decline to speak to officers from the Huron Police Department who approach them for voluntary interviews. The police do not usually seize them and prosecute them for failing to consent to voluntary interviews.

120.     The City prosecuted Mrs. Hinners based on her exercise of her First Amendment rights to criticize City Council's secret payments and to petition the government for redress of that grievance.

121.     As a prosecutor, Defendant O'Shea is required to dismiss charges that are not supported by probable cause.

122.     Instead of dismissing the unsupported resisting-arrest charge, Defendant O'Shea used it as a bargaining chip on the obstruction charge: If Mrs. Hinners would waive her right to a speedy trial on the new charge and enter a written plea to that charge, saving him the time and expense of a trip to court, the state would move to dismiss the resisting charge at the City's cost "[o]nce this new charge is docketed."[66]

123.     Mrs. Hinners agreed to the deal, but when she filed her waiver and plea, Defendant O'Shea did not drop the resisting-arrest charge.

124.     Through counsel, Mrs. Hinners notified Defendant O'Shea of the stress the resisting-arrest charge was causing her and repeatedly requested a prompt dismissal of the charge.

125.     Defendant O'Shea allowed the resisting-arrest charge to hang over Mrs. Hinners's head for months beyond when he concluded it was not supported.

---

[66] O'Shea e-mail to Chandra (July 31, 2019) (attached as Ex. D-25).

**The Erie County Court of Common Pleas appoints a special prosecutor to investigate criminal interference with Mrs. Hinners's civil rights.**

126.    Mrs. Hinners reported to Erie County Prosecutor Kevin Baxter that Mayor Hartung, Defendant Lane, and other officials acting on behalf of the City of Huron were conspiring to interfere with her civil rights and committing other offenses in the process. [67]

127.    On August 13, 2019, Prosecutor Baxter referred the matter to the Erie County Court of Common Pleas to request the appointment of a special prosecutor.

128.    The court granted that request on August 28, 2019. Its order appointed Attorney General Dave Yost to handle the investigation.[68]

129.    Attorney General Yost assigned the matter to his office's Special Prosecutions Section. Assistant Attorney General Stephanie Anderson assigned the Bureau of Criminal Investigation with investigating the conspiracy. That investigation is ongoing and could end at any time.

**Defendant O'Shea learns he is being used to retaliate against Mrs. Hinners. He refuses to dismiss the case.**

130.    In filings and conversations with defense counsel, Defendant O'Shea shifted to a sixth justification for the charges against Mrs. Hinners, saying it was her "entire course of conduct" at the May 14, 2019 meeting, including her invocation of her Fifth Amendment right not to talk to the police officers who tried to question her.[69]

131.    Over the course of the prosecution, Defendant O'Shea became aware that Mrs. Hinners was being prosecuted for conduct that the City routinely permits from citizens who are not suing it for making secret payments to its executives.

---

[67] Chandra letter to Baxter (May 30, 2019) (attached as Ex. A-13); Chandra letter to Baxter (Jun. 19, 2019) (attached as Ex. A-14).

[68] Judgment Entry, Case No. 2019-MS-92 (Erie C.P.) Aug. 28, 2019 (attached as Ex. A-15).

[69] Chandra Decl. at ¶ 12 (attached as Ex. A).

132.     Defendant O'Shea was in possession of dozens of hours of video and audio evidence demonstrating that everything Mayor Hartung had accused her of was normal behavior at Council meetings.

133.     Defendant O'Shea also solicited written statements from City officials who were present at the meeting. Mayor Hartung,[70] Mr. Schaffter,[71] Mr. White,[72] Ms. Gibboney,[73] Mr. Ginesi,[74] and Mr. Hardy[75] each provided a statement.

134.     Each of their narratives contained false statements about the interactions between Mrs. Hinners and Mayor Hartung, lending support to the various false justifications Mayor Hartung had offered as bases for the charges against Mrs. Hinners.

135.     Mayor Hartung, Mr. Ginesi, and Mr. Hardy falsely reported that Mayor Hartung had instructed Mrs. Hinners to "turn around" or "face the council." As the recordings how, Mayor Hartung never instructed Mrs. Hinners to turn around or to face council.

136.     Mayor Hartung, Mr. Schaffter, Mr. White, and Ms. Gibboney falsely reported that Mayor Hartung repeatedly directed Mrs. Hinners to step to the podium. As the recordings show, Mayor Hartung asked Mrs. Hinners to step to the podium only once.

137.     Mayor Hartung, Mr. Schaffter, Mr. White, and Ms. Gibboney falsely reported that Mrs. Hinners ignored Mayor Hartung's request to step to the podium. As the recordings show, Mrs. Hinners complied with that request without question.

---

[70] Hartung statement (May 15, 2019) (attached as Ex. D-11).

[71] Schaffter statement (June 27, 2019) (attached as Ex. D-13).

[72] White statement (June 27, 2019) (attached as Ex. D-14).

[73] Gibboney statement (July 1, 2019) (attached as Ex. D-15).

[74] Ginesi statement (July 1, 2019) (attached as Ex. D-16).

[75] Hardy statement (July 2, 2019) (attached as Ex. D-17).

138.    Defendant O'Shea knew from reviewing the video and audio evidence that those witness statements were false.

139.    Defendant O'Shea's knowledge that he was facilitating a selective prosecution required him to dismiss the case. He did not.

140.    On September 6, 2019, Mrs. Hinners filed a motion to dismiss the prosecution based on selective prosecution in retaliation of her exercise of her First Amendment rights.

141.    In his written response of September 18, Defendant O'Shea never disputed any of the facts supporting Mrs. Hinners's selective-prosecution defense.

142.    The Huron Municipal Court scheduled a hearing for October 7, 2019, to determine whether Defendant O'Shea was selectively prosecuting Mrs. Hinners in violation of her First Amendment rights.

143.    On the last business day before the hearing, Defendant O'Shea reneged on stipulations as to various pieces of evidence central to Mrs. Hinners's selective-prosecution defense.

144.    Defendant O'Shea reneged on those stipulations in bad faith and solely to prevent the court from receiving evidence of the retaliatory nature of his prosecution.

**Defendant O'Shea cuts and runs—with a vow to return.**

145.    With the selective-prosecution hearing approaching, Defendant O'Shea attempted to find evidence to rebut the allegation of selective prosecution.

146.    By 1:30 p.m. on October 7—half an hour before the selective-prosecution hearing was scheduled to begin—Defendant O'Shea had inquired into the discrepancy between the City's treatment of Mrs. Hinners and similarly situated speakers at City Council meetings.

147.    Mayor Hartung never provided a plausible explanation for the decision to target Mrs. Hinners without prosecuting any other citizens who engaged in similar behavior.

148.    Defendant Lane never provided a plausible explanation for the decision to target Mrs. Hinners without prosecuting any other citizens who engaged in similar behavior.

149.    No one else provided a plausible explanation for the decision to target Mrs. Hinners without prosecuting any other citizens who engaged in similar behavior.

150.    Defendant O'Shea arrived for the hearing without having subpoenaed any witnesses to present his case.

151.    Defendant O'Shea arrived for the hearing without any exhibits to enter into evidence.

152.    Defendant O'Shea consulted again with the conflicted Director Lane about how he should proceed.

153.    Half an hour before the selective-prosecution hearing was scheduled to begin, Defendant O'Shea filed a motion to dismiss the case without prejudice because his key witnesses were under criminal investigation for interfering with Mrs. Hinners's civil rights in violation of Ohio Rev. Code § 2921.45.

154.    Defendant O'Shea maintained falsely that Mrs. Hinners's charges were supported by probable cause. At O'Shea's request, the Court dismissed the charges without prejudice, leaving O'Shea free to refile them if his witnesses were cleared of criminal liability.[76]

155.    In court and in the press, O'Shea explicitly held out the possibility of charging Mrs. Hinners again.[77]

---

[76] Judgment Entry, *State v. Hinners*, No. 19-CRB-126BC, Huron Muni. Ct. (Oct. 7, 2019) (attached as Ex. D-10).

[77] Michael Harrington, *Huron dismisses charges against Hinners*, Sandusky Register (Oct. 10, 2019), http://www.sanduskyregister.com/story/201910080010 (attached as Ex. L).

**With Mayor Hartung and Mr. Ginesi out of office, their replacements refuse
to reverse the damage done and avoid litigation.**

156.    Since Mayor Hartung ordered the prosecution of Mrs. Hinners, the people of Huron have

rallied around her, hounding City Council to reverse course and acknowledge the valuable

contributions she makes to the City's civic life. In the face of this opposition, Mayor Hartung began

skipping council meetings, attending only one more before resigning altogether.

157.    And, incensed by his attempts to weaponize the church against Mr. Hinners, Huron's voters

drummed Mr. Ginesi out of office on November 5, when they voted in a slate of three new, reform-

minded candidates who have pledged to bring transparency to the City's operations.

158.    The new council has been sworn in and met twice since the election. It has not deviated

from its posture supporting the prosecution of Mrs. Hinners.

159.    The prosecution and ongoing threat of prosecution have had and continue to have a chilling

effect on Mrs. Hinners. The community continues to seek her out for insights, but not knowing

what else might trigger a prosecution, Mrs. Hinners still has not spoken publicly about city business

since police dragged her out of the May 14 meeting.

160.    The prosecution and ongoing threat of prosecution have had and continue to have a chilling

effect on Mrs. Hinners.

161.    Not knowing what else might trigger a prosecution, Mrs. Hinners still has not spoken

publicly about city business since police dragged her out of the May 14 meeting.

162.    Mrs. Hinners has drafted a new post for The Talk of Huron. She is prepared to post it, but

unwilling to do so until she knows that it will not trigger refiled charges or any other retaliation.

### CLAIM 1
### EQUAL PROTECTION DEPRIVATION, 42 U.S.C. § 1983 — SELECTIVE PROSECUTION

163.    Plaintiff incorporates all previous allegations.

164.    In opposing secret payments to Mr. White and engaging in other protected activity, Mrs. Hinners was exercising her clearly established constitutional and statutory rights.

165.    Dozens of similarly situated people who have not opposed secret payments to Mr. White have engaged in the same kinds of conduct that prompted the charges against Mrs. Hinners. No one else has ever been charged for that conduct:

    a.    For instance, from January 9, 2018, through May 22, 2018, Council had permitted people to speak without approaching the podium at least 12 times.[78]

    b.    From January 23, 2018, through February 12, 2019, Council had permitted people to exceed the stated time limit at least 34 times.[79]

    c.    From January 23, 2018, through January 8, 2019, Council had permitted "turning and talking" by speakers at least 12 times.[80]

166.    None of those people were speaking about secret payments to Mr. White, and none of them were cut off, ejected from the meeting, arrested, or prosecuted for their speeches.

167.    Lane and Defendant O'Shea's purpose in prosecuting Mrs. Hinners was to retaliate for her exercise of her constitutional and statutory rights.

168.    Lane and Defendant O'Shea's conduct violated Mrs. Hinners's clearly established Fourteenth Amendment right to be free from prosecution on the basis of Mrs. Hinners's exercise of her constitutional and statutory rights.

---

[78] *See* Ex. B-15 (compiling instances of guests at City Council meetings speaking without approaching the podium).

[79] *See* Ex. B-16 (compiling instances of guests at City Council meetings directly addressing the audience).

[80] *See* Ex. B-17 (compiling instances of guests at City Council meetings exceeding the three– or five-minute limit).

## CLAIM 2
## FIRST AMENDMENT RETALIATION, 42 U.S.C. § 1983—RETALIATORY ARREST

169. Plaintiff incorporates all previous allegations.

170. At all material times, Mrs. Hinners was exercising her clearly established constitutional and statutory rights, including the right to practice their religion consistent with their sincerely held beliefs, the right to free speech, the right to freedom of the press, the right to peaceably assemble, and the right to petition the government for redress of grievances.

171. Defendant O'Shea—in concert with other City officials—sought to unlawfully interfere with the Hinnerses' exercise of their clearly established rights through a series of adverse actions ("the Retaliation Campaign"), including, but not limited to:

    a.      lodging criticisms of Mr. Hinners with his priest;

    b.      discouraging Father McBeth from allowing Mr. Hinners to become a deacon;

    c.      shouting at Mrs. Hinners in a public meeting;

    d.      summoning the police in response to Mrs. Hinners's speech;

    e.      cutting her off before her time had expired;

    f.      threatening to charge her with disrupting a public meeting;

    g.      ordering her removed from the meeting;

    h.      critiquing her speech in front of her assembled neighbors;

    i.      charging her with disturbing a lawful meeting;

    j.      charging her with resisting arrest;

    k.      charging her with obstructing official business;

    l.      making knowingly false statements to the press about the charges against her;

    m.      making knowingly false statements in connection with the prosecution of those charges;

n.      refusing to drop the charges against Mrs. Hinners unless she said probable cause supported the charges against her;

o.      attempting to dissuade the trial court from holding a constitutionally mandated hearing on her First Amendment defenses;

p.      refusing to timely honor the bargain to dismiss the resisting-arrest charge against her;

q.      refusing to stipulate to the authenticity of evidence whose authenticity was undisputed;

r.      refusing to dismiss all charges with prejudice; and

s.      continuing to threaten further prosecution.

172.    The Retaliation Campaign injured Mrs. Hinners by restraining, preventing, and impairing her exercise of her rights, and did so in a way likely to chill a person of ordinary firmness from continuing to exercise those rights.

173.    Defendant O'Shea was motivated to prosecute Mrs. Hinners based on her exercise of her constitutional rights.

174.    Defendant O'Shea's actions violated Mrs. Hinners's clearly established First and Fourteenth Amendment rights.

### CLAIM 3
### FIRST AMENDMENT RETALIATION, 42 U.S.C. § 1983—PRIOR RESTRAINT

175.    Plaintiff incorporates all previous allegations.

176.    "[P]rior restraints on speech and publication are the most serious and the least tolerable infringement on First Amendment rights."[81]

---

[81] *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976).

177.    Prior restraints can take many forms, including court orders,[82] statutes,[83] or even "informal procedures undertaken by officials and designed to chill expression."[84]

178.    Some prior restraints, such as court orders not to publish information, are explicit.[85] But even more subtle governmental action, such as an ordinance allowing a ban on newsracks on the sidewalks, can effect a prior restraint.[86]

179.    As in this case, threats of criminal prosecution can also effect a prior restraint.[87]

180.    At all material times, Mrs. Hinners was engaged in constitutionally protected activity.

181.    Defendant O'Shea–in concert with other City officials—sought to effect unlawful prior restraints on Mrs. Hinners by executing the Retaliation Campaign in an effort to chill her and her husband from engaging in protected activity.

182.    The Retaliation Campaign injured Mrs. Hinners by restraining, preventing, and impairing her exercise of her rights, and did so in a way likely to chill a person of ordinary firmness from continuing to exercise those rights.

183.    Defendant O'Shea's participation in the Retaliation Campaign violated Mrs. Hinners's clearly established First and Fourteenth Amendment rights.

---

[82] *New York Times Co. v. United States*, 403 U.S. 713, 715 (1971) (court order preventing "publication of information whose disclosure would endanger the national security" is a "flagrant, indefensible, and continuing violation of the First Amendment.")(Black, concurring).

[83] *Near v. State of Minnesota ex rel. Olson*, 283 U.S. 697, 723 (1931) (Statute prohibiting publication of "malicious, scandalous and defamatory matter" is a prior restraint and "an infringement of the liberty of the press guaranteed by the Fourteenth Amendment.").

[84] *Multimedia Holdings Corp. v. Circuit Court of Fla., St. Johns Cty.*, 544 U.S. 1301, 1306 (2005).

[85] *New York Times Co.*, 403 U.S. at 715 (court order preventing "publication of information whose disclosure would endanger the national security" is a "flagrant, indefensible, and continuing violation of the First Amendment.")(Black, concurring).

[86] *City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 757 (1988) ("[A] licensing statute placing unbridled discretion in the hands of a government official or agency constitutes a prior restraint.").

[87] *Novak v. City of Parma*, 932 F.3d 421, 433 (6th Cir. 2019) (citing *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963))("Novak also plausibly alleges that the officers created a prior restraint with their press release threatening to take legal action.").

## CLAIM 4
## FIRST AMENDMENT VIOLATION, 42 U.S.C. § 1983— H.C.O. § 509.04 IS UNCONSTITUTIONAL AS APPLIED

184.     Plaintiff incorporates all previous allegations.

185.     H.C.O. § 509.04 cannot be constitutionally applied to Mrs. Hinners's speech. Mrs. Hinners's speech was protected by the First and Fourteenth Amendments, as any reasonable observer would know.

186.     No substantial or compelling governmental interest exists for criminally punishing Mrs. Hinners for her speech.

187.     No governmental interest in proscribing Mrs. Hinners's speech outweighs her First Amendment right to make it.

## CLAIM 5
## FIRST AMENDMENT VIOLATION, 42 U.S.C. § 1983— H.C.O. § 525.07 IS UNCONSTITUTIONAL AS APPLIED

188.     Plaintiff incorporates all previous allegations.

189.     H.C.O. § 525.07 cannot be constitutionally applied to Mrs. Hinners's choice to remain in the meeting rather than speaking to the police. That decision was protected by the First and Fourteenth Amendments, as any reasonable observer would know.

190.     No substantial or compelling governmental interest exists for criminally punishing Mrs. Hinners for that decision.

191.     No governmental interest in proscribing that decision outweighs Mrs. Hinners's First Amendment right to make it.

## CLAIM 6
## FIFTH AMENDMENT VIOLATION, 42 U.S.C. § 1983— H.C.O. § 525.07 IS UNCONSTITUTIONAL AS APPLIED

192.     Plaintiff incorporates all previous allegations.

194.    H.C.O. § 525.07 cannot be constitutionally applied to Mrs. Hinners's choice to remain in the meeting rather than speaking to the police. That decision was protected by the Fifth and Fourteenth Amendments, as any reasonable observer would know.

195.    No substantial or compelling governmental interest exists for criminally punishing Mrs. Hinners for that decision.

196.    No governmental interest in proscribing that decision outweighs Mrs. Hinners's Fifth Amendment right to make it.

<h2 align="center">PRAYER FOR RELIEF</h2>

Mrs. Hinners therefore respectfully requests the following relief from the Court:

A. Enter judgment in her favor on all claims for relief;

B. Declare that Defendants' acts and conduct constitute violations of the First, Fourth, Fifth, and Fourteenth Amendments to the United States Constitution, as well as violations of 42 U.S.C. §§ 1983 and 1985.

C. Award injunctive relief barring further prosecution of Mrs. Hinners.

D. Award injunctive relief barring Defendants from perpetrating further unlawful acts such as the ones that injured Mrs. Hinners;

E. Award injunctive relief enjoining Defendants from further unlawful application of Ohio law;

F. Award reasonable attorneys' fees and all other costs of suit available under 42 U.S.C. § 1988; and

G. Award all other relief in law or equity, including injunctive relief, that the Court deems equitable, just, and proper.

<h2 align="center">VERIFICATION</h2>

I declare under penalty of perjury that the statements in this Complaint are true and correct to the best of my knowledge, belief, and understanding.

Stacy Hinners

12/11/19
Date

Respectfully submitted,

THE CHANDRA LAW FIRM LLC

*/s/ Brian D. Bardwell*
Subodh Chandra (0069233)
Brian D. Bardwell (0098423)
The Chandra Law Building
1265 W. 6th St., Ste. 400
Cleveland, Ohio 44113
216.578.1700 Phone
216.578.1800 Fax
Subodh.Chandra@ChandraLaw.com
Brian.Bardwell@ChandraLaw.com

*Attorneys for Plaintiff Stacy Hinners*