IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

|  |  |
|---|---|
| **STACY HINNERS**<br>1130 Mudbrook Road<br>Huron, OH 44839<br><br>*and*<br><br>**JASON HINNERS**<br>1130 Mudbrook Road<br>Huron, OH 44839<br><br>*Plaintiffs,*<br><br>v.<br><br>**CITY OF HURON**<br>417 Main Street<br>Huron, OH 44839<br><br>*and*<br><br>**BRAD HARTUNG**<br>816 Salem Drive<br>Huron, OH 44839<br>*(in his individual capacity)*<br><br>*and*<br><br>**ANDREW WHITE**<br>315 Williams St.<br>Huron, OH 44839<br>*(in his individual capacity)*<br><br>*and*<br><br>**AIMEE LANE**<br>11021 Fitzwater Rd<br>Brecksville, OH 44141<br>*(in her individual capacity)*<br><br>*and*<br><br>**GLEN GINESI**<br>214 Shawnee Place<br>Huron, OH 44839<br>*(in his individual capacity)*<br><br>*and*<br><br>**RICK SCHAFFTER**<br>507 Liberty Drive, Apt. C<br>Huron, OH 44839 | Case No. 19-CV-02868<br><br>Judge Pamela A. Barker<br><br>Magistrate Judge David A. Ruiz |

*(in his individual capacity)*
                    *and*

**TREY HARDY**
1007 Harborview Drive
Huron, OH 44839
*(in his individual and official capacity)*
                    *and*

**ROBERT LIPPERT**
417 Main Street
Huron, OH 44839
*(in his individual and official capacity)*
                    *and*

**JOHN ORZECH**
417 Main Street
Huron, OH 44839
*(in his individual and official capacity)*
                    *and*

**KEVIN KOEHLER**
417 Main Street
Huron, OH 44839
*(in his individual and official capacity)*
                    *and*

**WALTER HAVERFIELD LLP**
The Tower at Erieview
1301 East Ninth Street, Suite 3500
Cleveland, OH 44114
                    *and*

**MICHAEL O'SHEA**
Hoyt Block Building, Suite 110
700 West Saint Clair Avenue
Cleveland, OH 44113
*(in his individual and official capacity)*
                    *Defendants.*

---

**FIRST AMENDED AND SUPPLEMENTAL COMPLAINT WITH JURY DEMAND**

### NATURE OF THE ACTION

1.      Criticizing the government is a fundamental right enjoyed by every American, necessary to

protect our democratic system of government.

2.      But the City of Huron, through its highest-ranking officials, including then-Mayor Brad Hartung, has adopted a policy of harassing two of its residents in retaliation for their criticisms. That policy began with attempts to interfere with their exercise of their religion and culminated in the arrest of Plaintiff Stacy Hinners for speaking at a City Council meeting.[1] That campaign of harassment was in retaliation for Mrs. Hinners, with her husband, Jason, engaging in a wide variety of First Amendment–protected activity, including spoken criticism, written criticism, assembly, petitioning the government, and exercise of her religion.

3.      After that arrest, Defendant Aimee Lane—the City's law director and a key participant in the decision to pursue charges against Mrs. Hinners—Defendant Walter Haverfield, and the City improperly contracted Defendant Michael O'Shea, a personal-injury and DUI-defense attorney, to act as an assistant prosecutor. Lane acknowledged that a conflict of interest barred her from participating in the prosecution, but she continued to direct and advise O'Shea's handling of the case, in an effort to limit the civil liability to which she and other city officials were exposed.

4.      Defendant O'Shea quickly recognized that the charges against Mrs. Hinners were purely political and that Mrs. Hinners was being selectively prosecuted in retaliation for her exercise of her First Amendment rights.[2] Despite this knowledge, he continued to press for a conviction, temporarily acquiescing only minutes before a hearing where he would have been required to explain why Mrs. Hinners was the first and only person ever to have been charged with violating the City's "disturbing a lawful meeting" ordinance.

---

[1] The State produced an audio recording of the full meeting in discovery, as well as several videos showing parts of the meeting, but there are no known videos of the full meeting. Those recordings are being manually filed as Exs. A-1, A-2, A-3, A-4, A-5, and A-6. A compilation of footage available from various sources is being manually filed as Ex. A-7.

[2] *See* Exs. B-15, B-16, and B-17 (compiling instances of guests at City Council meetings engaging in conduct identical to that for which Mrs. Hinners was prosecuted, e.g., speaking without approaching the podium, directly addressing the audience, and exceeding the three- or five-minute limit).

5. Even when forced to dismiss the charges, Defendant O'Shea insisted on a dismissal *without* prejudice, explicitly holding out the threat of refiling charges against Mrs. Hinners.

6. Defendants' harassment and prosecution of Mrs. Hinners has seriously chilled her exercise of her First Amendment rights. Only this Court's intervention can put an end to the City's efforts to silence its critics by threatening them with criminal prosecution.

## PARTIES

7. Plaintiff Stacy Hinners is a resident of the City of Huron, in Erie County, Ohio. She is a licensed attorney actively engaged in citizen oversight of the local government.

8. Plaintiff Jason Hinners, Stacy Hinners's husband, is also a resident of Huron, Erie County, Ohio. He, too, is a licensed attorney actively engaged in citizen oversight of local government.

9. Defendant City of Huron ("the City") is a municipal corporation under Article XVIII of the Ohio Constitution and a "person" subject to suit within the meaning of 42 U.S.C. § 1983.

10. Defendant Brad Hartung, sued in his individual capacity, is a resident of Erie County, Ohio and at all times relevant to this complaint, through July 23, 2019, was the mayor of the City of Huron and chair of its City Council.

11. Defendant Aimee Lane, sued in her individual capacity, is a resident of Cuyahoga County and a former partner at the Cleveland office of Walter Haverfield. Through her firm, she served as the law director for the City of Huron at all times relevant to this complaint, up through October 31, 2019.

12. Defendant Glen Ginesi, sued in his individual capacity, is a resident of Erie County, Ohio and a member of Huron City Council at all times relevant to this complaint, through December 1, 2019.

13.     Defendant Rick Schaffter, sued in his individual capacity, is a resident of Erie County, Ohio and a member of Huron City Council at all times relevant to this complaint, through December 1, 2019.

14.     Defendant Trey Hardy, sued in his individual and official capacity, is a resident of Erie County, Ohio and, at all times relevant to this complaint, a member of Huron City Council.

15.     Defendant Andrew White, sued in his individual and official capacity, is a resident of Erie County, Ohio, and all times relevant to this complaint, the city manager for the City of Huron, through March 20, 2020.

16.     Defendant Robert Lippert, sued in his individual and official capacity, is a resident of Erie County and, at all times relevant to this complaint, chief of the Huron Police Department.

17.     Defendant John Orzech, sued in his individual and official capacity, is a resident of Erie County and, at all times relevant to this complaint, an officer in the Huron Police Department.

18.     Defendant Kevin Koehler, sued in his individual and official capacity, is a resident of Erie County and, at all times relevant to this complaint, an officer in the Huron Police Department.

19.     Defendant Walter Haverfield LLP is a limited-liability partnership with its principal place of business in Cuyahoga County. Since April 1, 2019, it has contracted with Defendant City of Huron to provide general legal services.

20.     Defendant Michael O'Shea, sued in his individual and official capacity, is a resident of Cuyahoga County and the principal of the Lipson O'Shea Legal Group in Cleveland. Defendant Lane contracted Defendant O'Shea to serve as an assistant prosecutor for the purpose of convicting Mrs. Hinners of various offenses in connection with a speech she gave at a meeting of Huron City Council.

21.     All Defendants acted under color of state and local law.

## JURISDICTION AND VENUE

22.     Under 28 U.S.C. §§ 1331, 1343, and 2201, this Court has jurisdiction over Mrs. Hinners's

federal claims under 42 U.S.C. §§ 1983, and 1988, which provides for attorneys' fees in civil-rights

claims. The Court has supplemental jurisdiction over her state-law claims under 28 U.S.C. § 1367.

23.     This case is not a candidate for *Younger* abstention. *Younger v. Harris*, 401 U.S. 37 (1971), held

that the possibility that a law is facially unconstitutional does not normally justify an injunction

against a *pending* prosecution. Here, Mrs. Hinners brings only *as applied* challenges to a prosecution

that is threatened, but *not yet pending*. And *Younger* carved out exceptions for cases—like this one—

that challenge laws that are "vague or overly broad as construed and applied to a particular

defendant in a particular case," *id.* at 48, as well as for cases that are "brought in bad faith," *id.* at 49,

"only one of a series of repeated prosecutions," *id.* at 49, "not made with any expectation of securing

valid convictions," *id.* at 48, brought "to harass appellants," *id.* at 48, or brought against defendants

to "discourage them and their supporters from asserting and attempting to vindicate …

constitutional rights," *id.* at 48.

     a.     At no point since this civil action was filed has there been a state criminal proceeding

     pending against Mrs. Hinners related to her conduct at the May 14, 2019, meeting.

     b.     Defendant O'Shea does not have a definite timetable to refile charges against Mrs.

     Hinners.

     c.     Mrs. Hinners faces a genuine threat of state prosecution from Defendant O'Shea.

     d.     Mrs. Hinners was never tried or convicted of any crime in connection with the May

     14, 2019, meeting. A judgment in her favor would not annul the results of a state trial, nor

     would it expunge her record or annul any collateral effects of such a conviction.

     e.     In raising claims for injunctive relief, Mrs. Hinners seeks only to be free from

     prosecutions for future violations of the same laws.

f.      As discussed below, the prosecution of Mrs. Hinners was initiated and pursued in

bad faith.

g.      If Defendant O'Shea refiles charges against Mrs. Hinners, they would be the latest in

a series of successive prosecutions for the same conduct.

h.      As discussed below, the uncontroverted evidence of selective prosecution

demonstrates Defendants have no expectation of securing a valid conviction against Mrs.

Hinners.

i.      As discussed below, Defendants brought charges against Mrs. Hinners to discourage

her and her husband from asserting and attempting to vindicate their constitutional rights.

24.    This Court has personal jurisdiction over Defendants, who reside in and conduct business in

Cuyahoga County and Erie County.

25.    Venue is proper under 28 U.S.C. § 1391 because the events giving rise to these claims took

place within this District.

## FACTUAL BACKGROUND

26.    For the past two years, the residents of Huron have been particularly engaged in local affairs,

voicing their frustration with Huron City Council over its failure to conduct its business in a

transparent manner—and the host of resulting problems, including light pollution,[3] deadly

conditions at a mobile home park,[4] and a marijuana dispensary setting up shop near an elementary

school.[5]

---

[3] Andy Ouriel, *Mucci can't expand until light problem gets fixed*, Sandusky Register (Jan. 20, 2019), http://www.sanduskyregister.com/story/201901200003 [perma.cc/Z7WW-H4DN] (attached as Ex. F).

[4] Andy Ouriel, *Huron begins process to clean up Oster's*, Sandusky Register (Jul. 2, 2019), http://www.sanduskyregister.com/story/201907010034 [perma.cc/2SXJ-NUMP] (attached as Ex. G).

[5] Andy Ouriel, *Huron's medical marijuana company sues city, state*, Sandusky Register (Oct. 19, 2018), http://www.sanduskyregister.com/story/201810180037 [perma.cc/L5YB-EFCH] (attached as Ex. H).

27.    City Council meetings are regularly packed with so many citizens that the City has to open up overflow seating. At least once, the City had to move a meeting to a high-school auditorium to accommodate the audience.[6]

28.    Stacy Hinners and Jason Hinners are among those citizens concerned about how Council is managing local affairs, and they have committed to making the public more informed about the business of their government.

29.    To that end, Mr. and Mrs. Hinners began regularly publishing news and commentary to a social-media page called "The Talk of Huron" about developments at City Hall and other news related to issues of public concern, including regular updates and commentary about City Council's activities.[7] Their readers are highly engaged. For instance:

    a.    On August 30, 2017, Mrs. Hinners published commentary about the Ohio Environmental Protection Agency approving the sale of lakefront property where ConAgra previously operated a grain elevator ("the ConAgra site"). Her post attracted 96 comments and was shared with the social networks of 12 more people.[8]

    b.    On November 30, 2017, Mrs. Hinners published news and commentary about the Ohio Department of Commerce approving OPC Cultivation LLC to operate as a marijuana cultivator in Huron. Her post attracted 611 comments and was shared with the social networks of 23 more people.[9]

    c.    On February 27, 2018, Mrs. Hinners published coverage of that night's Council meeting, noting the approval of a resolution to prevent any marijuana dispensary from moving

---

[6] Andy Ouriel, *Huron moves medical marijuana meeting to McCormick*, Sandusky Register (January 17, 2018), http://www.sanduskyregister.com/story/201801160039 [perma.cc/UE2L-8W7B] (attached as Ex. I).

[7] Hinners "Talk of Huron" posts (attached as Ex. B-20).

[8] *Id.* at 1.

[9] *Id.* at 14.

within 1,000 feet of any school in the City. Her post attracted 404 comments and was shared with the social networks of 5 more people.[10]

d.   On May 5, 2018, Mrs. Hinners published records and commentary about the City using taxpayer funds to defend OPC Cultivation from public criticism, and about the failure of the institutional press to scrutinize Council's interactions with OPC Cultivation. Her post attracted 152 comments and was shared with the social networks of 3 more people.[11]

e.   On October 9, 2018, Mrs. Hinners published analysis of that night's City Council meeting, applauding Defendant Hartung and City Council for taking steps to prevent OPC Cultivation from opening a dispensary near Woodlands Elementary School. Her post attracted 191 comments.[12]

f.   After the December 11, 2018, meeting, Mrs. Hinners published documents and commentary about the City's plan to accept only two dollars in exchange for three acres of government land and a commitment to invest more than $1.5 million in taxpayer dollars in infrastructure. Her post attracted 152 comments.[13]

g.   On December 17, 2018, Mrs. Hinners published coverage of an upcoming meeting of Council's Economic Development Committee, notifying the public that it would be meeting that evening to consider plans for the ConAgra site, and encouraging them to show up and voice their opinions. After that meeting, Mrs. Hinners followed up by publishing records and additional commentary. Her post attracted 108 comments.[14]

---

[10] *Id.* at 66.

[11] *Id.* at 104.

[12] *Id.* at 122.

[13] *Id.* at 146.

[14] *Id.* at 169.

30.     Under the Free Speech Clause and Free Press Clause, Mrs. Hinners's posts to The Talk of Huron are First Amendment–protected activity.

31.     To promote more transparent government, Mr. and Mrs. Hinners began regularly attending and speaking at City Council meetings, and they began using the Ohio Public Records Act[15] to educate themselves and their neighbors about what was motivating Council's pursuit of policies in the face of such overwhelming public opposition.

32.     As members of a broader group of citizens asking for public records about Council's efforts to lure OPC Cultivation into the city, Mr. and Mrs. Hinners were part of what Defendant White called a "bad group" made up of "bad people stirring up nonsense."

33.     Under the Free Speech Clause and the Assembly Clause, Mr. and Mrs. Hinners's attendance at City Council meetings is First Amendment–protected activity.

34.     Under the Free Speech Clause and the Petition Clause, Mr. and Mrs. Hinners's requests for public records were First Amendment–protected activity.

35.     When the City refused to turn over records of Council's communications, Mr. Hinners sued for access—and won.[16]

36.     Later that year, Mr. and Mrs. Hinners were gathering information about the finding of the State of Ohio Auditor against the City of Huron because of mid-term salary increases given by Council to three of its councilmembers. Again, the City refused to turn those records over. Again, Mr. Hinners sued. Almost immediately after, the City turned over the records.

37.     Under the Free Speech Clause and the Petition Clause, Mr. Hinners's lawsuits are First Amendment–protected activity.

---

[15] Ohio Rev. Code § 149.43.

[16] *Hinners v. City of Huron*, No. 2018-00549, 2018 WL 4560012 (Ohio Ct. Cl. Sep. 11, 2018).

**Defendant Ginesi opens the City's campaign of retaliation.**

38.     During a town-hall meeting about a local development project, Mr. and Mrs. Hinners challenged Defendant White about the City's plans to move forward with a development agreement they thought was not the right plan for the City.

39.     Their opposition to the development agreement was protected by the First Amendment.

40.     After that meeting, Defendant White and members of council began discussing a plan to "get" Mr. and Mrs. Hinners in retaliation for their opposition to City officials' agenda.

41.     Through their public-records requests, Mr. and Mrs. Hinners learned that City Council had met behind closed doors to approve secret payments to City Manager Andrew White. Mr. and Mrs. Hinners sent a letter to the City on April 8, 2019, explaining that the payments violated the Open Meetings Act and requesting that the City recoup them.

42.     Shortly after receiving that letter, Huron City Council and its appointed officials began advancing their plan to intimidate Mr. and Mrs. Hinners in retaliation for engaging in First Amendment–protected activity, including their criticism of city officials, their public-records lawsuits, and their open-meetings lawsuit.

43.     Soon after, Councilman Glen Ginesi approached Father Jeffrey McBeth, the pastor of St. Peter's Catholic Church, where both he and the Hinners family attend weekly Mass. Jason Hinners is training to become a member of the clergy as a permanent deacon in the Diocese of Toledo.[17]

44.     Defendant Ginesi was on his way to a city council meeting and asked Father McBeth for time to talk about Mr. Hinners. He told Father McBeth that "as a member of council," he felt attacked by Mr. Hinners "causing problems" at City Council meetings and criticizing the

---

[17] McBeth Aff., ¶ 4 (attached as Ex. J).

government.[18] Defendant Ginesi complained to Father McBeth that by criticizing City Council, Mr. Hinners was acting in a "non-Christian" way.[19]

45.    Contrary to Defendant Ginesi's complaints, the Catholic Church calls on its members to speak out against injustice wherever they see it.[20]

46.    Defendant Ginesi told Father McBeth that he was "bewildered" to learn Mr. Hinners was under consideration for the diaconate or any prominent leadership role within the Church.[21]

47.    Defendant Ginesi asked Father McBeth to relay his complaints to Mr. Hinners. He directed Father McBeth to "tell him you heard it from me."[22]

48.    Under the Establishment Clause and the Free Speech Clause, the Catholic Church's and Mr. Hinners's judgments and teachings as to what behavior is "Christian" or "non-Christian" are First Amendment–protected activity.

49.    Under the Free Exercise Clause, the Free Speech Clause, and the Assembly Clause, Mr. and Mrs. Hinners's involvement at their church and their practice of their religion consistent with their sincerely held beliefs is First Amendment–protected activity.

### Mrs. Hinners files suit to address the culture of secrecy among Huron City Council. Defendant Hartung retaliates immediately.

50.    Before Father McBeth reported the conversation to Mr. Hinners, Mr. and Mrs. Hinners filed another lawsuit against the City.

51.    Through their digging, they had discovered that Council had repeatedly held clandestine meetings to approve thousands of dollars in secret payments to City Manager Andrew White.

---

[18] *Id.* at ¶ 5.
[19] *Id.* at ¶ 6.
[20] *Id.* at ¶ 9.
[21] *Id.* at ¶ 6.
[22] *Id.* at ¶ 7.

52.     Mr. and Mrs. Hinners repeatedly reached out to City leaders to encourage them to reverse those payments and commit to complying with their obligations to conduct public business in public.

53.     The City refused.

54.     Mr. and Mrs. Hinners filed an Open Meetings Act[23] lawsuit on May 13, 2019, to nullify those payments and force the City to comply with the Open Meetings Act.[24]

55.     The following evening, Mrs. Hinners attended a regular meeting of Huron City Council.

56.     As scheduled, that meeting ran from about 6:30 p.m. to 8:30 p.m.

57.     At about 6:45 p.m., during a portion of the meeting reserved for comments from the public, Mrs. Hinners rose from her seat to speak.[25]

58.     Defendant Hartung told Mrs. Hinners to speak from the podium instead.[26]

59.     Council routinely permits people to speak during the public-comment period without approaching the podium. From January 9, 2018, through May 22, 2018, Council had permitted people to speak without approaching the podium at least 13 times. None of those people were speaking about secret payments to Mr. White, and none of them were cut off, ejected from the meeting, arrested, or prosecuted for their speeches.

60.     Mrs. Hinners went to the lectern and restarted her speech.[27] Because the council chambers did not have a sound-amplification system, she turned to face the audience, ensuring that everyone present could hear her.

---

[23] Ohio Rev. Code § 121.22.

[24] Complaint, *Hinners v. Huron*, 2019 CV 0275 (Erie C.P.) (attached as Ex. B-1).

[25] Meeting video compilation at 0:11 (manually filed as Ex. A-7).

[26] *Id.* at 0:15.

[27] *Id.* at 0:32.

61.     Defendants Hartung and Lane believed that Mrs. Hinners was turning her back to Defendant Hartung to communicate a lack of respect for him or for City Council.

62.     They believed the audience understood Mrs. Hinners was indicating that lack of respect by turning her back to Defendant Hartung.

63.     Mrs. Hinners discussed several controversial decisions Council had made over the last two years. Whether they were good decisions or not, she said, "the community had a right to know about them and weigh in on them."[28]

64.     At no time did Mrs. Hinners have any intention to "disrupt" the City Council meeting.

65.     Seconds into the speech, Defendant Hartung began trying to summon police to arrest Mrs. Hinners. He repeatedly hit a panic button to get their attention.

66.     When the police did not immediately arrive, Defendant Hartung left the meeting and walked to the police department. Unable to find an officer there, Defendant Hartung returned to the meeting.

67.     One witness said the mayor was "visibly upset."[29] Watching how Defendant Hartung's "face got red," a first-time visitor to City Council was "flabbergasted" at how "angry and irate" he was.[30] She pulled out her camera because she could tell "something was amiss."[31]

68.     She was right. Defendant Hartung approached Director Lane. Pointing at Mrs. Hinners, he told Defendant Lane, "I want to have her charged."

69.     On information and belief, on the spot, Director Lane approved or endorsed the decision to charge Mrs. Hinners for her speech.

---

[28] *Id.* at 1:10.

[29] Tapp statement, 2 (attached as Ex. C-2).

[30] Jones statement, ¶ 4–5 (attached as Ex. C-3).

[31] *Id.* at ¶ 5.

70.     Director Lane's approval of that decision was not intimately associated with the judicial phase of the criminal process.[32]

71.     Sitting next to Lane and listening to the conversation, City Manager Andy White texted Chief of Police Robert Lippert, saying Hartung was "ignited" and "wants her arrested."[33]

72.     On information and belief, Chief Lippert contacted Officer John Orzech and instructed him to remove Mrs. Hinners from the meeting and file charges against her. Contrary to the Ohio Public Records Act, the City's records-retention schedule and contrary to their ordinary practice, Chief Lippert and Officer Orzech deleted their text messages from that day and the next day, when Officer Orzech added a charge of resisting arrest.

73.     Two minutes and 53 seconds into her speech, Mrs. Hinners first announced to her neighbors at the meeting her discovery that Council had made secret payments to Mr. White.

74.     When she made that announcement, Vice Mayor Trey Hardy immediately cut her off, telling her, falsely, that her three minutes were already expired.[34]

75.     Council routinely permits people to speak beyond the announced time limits for speakers in the public-comment period. From January 23, 2018, through February 12, 2019, Council had permitted people to exceed the stated time limit at least 48 times. None of those people were speaking about secret payments to Mr. White, and none of them were cut off, ejected from the meeting, arrested, or prosecuted for their speeches.

---

[32] *Burns v. Reed*, 500 U.S. 478, 496 (1991) ("[R]espondent has not met his burden of showing that the relevant factors justify an extension of absolute immunity to the prosecutorial function of giving legal advice to the police.").

[33] Text messages from White to Lippert (attached as Ex. B-2).

[34] Meeting video compilation at 3:20 (manually filed as Ex. A-7).

76.     Mrs. Hinners requested that she be extended Council's routine courtesy of an additional moment to conclude her remarks, but Defendant Hartung told her he was having her charged with a crime.

77.     Mrs. Hinners noted for the record the discrepancy between how she was being treated and how other citizens had been treated, and then she returned to her seat.

78.     Mrs. Hinners sat down less than 50 seconds after Mr. Hardy prematurely called time.[35]

79.     Under the Free Speech Clause and the Petition Clause, Mrs. Hinners's speech was First Amendment–protected activity.

80.     Neither Council nor Defendant Hartung ever ruled that Mrs. Hinners was out of order.

81.     Neither Council nor Defendant Hartung ever ordered Mrs. Hinners to leave the meeting.

82.     Neither Council nor Defendant Hartung ever suspended or recessed the meeting.

83.     After Mrs. Hinners noted that she was being singled out, Defendant Hartung offered his first justification for charging Mrs. Hinners: "You're making a mockery of the city council meeting by turning and talking."

84.     Although doing so would be protected speech under the First Amendment, Mrs. Hinners was not making a mockery of the meeting.

85.     After Mrs. Hinners sat down, the meeting continued without interruption for about five minutes as two other citizens spoke during the public-comment session.

86.     While Mrs. Hinners was sitting quietly and listening to other citizens speak, Officer Orzech and Officer Kevin Koehler arrived.[36] They stood behind the audience and observed nothing more than a routine meeting.[37]

---

[35] *Id.* at 4:17.

[36] *Id.* at 8:48.

[37] *Id.* at 8:48.

87.     Defendant Hartung walked out of the meeting and directed the police officers to seize Mrs. Hinners.[38] He believed that if he did not remove Mrs. Hinners from the meeting, she would continue to criticize him and Council, either during the meeting or immediately after. And in any event, he was angry and wanted to punish and retaliate against her for her critical remarks.

88.     Despite a city charter provision providing that the mayor "shall exercise no administrative authority," over city workers, the police readily acquiesced to Mayor Hartung's retaliation.[39]

89.     The police entered Council chambers and asked Mrs. Hinners if she would speak to them outside.[40]

90.     Mrs. Hinners, as she knew was her right, wanted to continue observing the public meeting, so she declined.[41]

91.     Defendant Hartung then ordered the police to remove Mrs. Hinners.[42]

92.     After giving that order, Defendant Hartung shifted to a second justification for charging Mrs. Hinners, saying it was because she didn't "get up … like everyone else does" to make her speech, when she was required to "stand up and … do it."

93.     Council routinely permits people to speak from their seats during City Council meetings. None of those people were speaking about secret payments to Mr. White, and none of them were ejected from the meeting, arrested, or prosecuted for their speeches.

94.     Although the First Amendment would have permitted her to remain seated during her speech, Mrs. Hinners did "get up" to make her speech.

---

[38] *Id.* at 9:02.

[39] Huron City Charter § 2.10 (attached as Ex. N).

[40] *Id.* at 9:17.

[41] *Id.* at 9:47.

[42] *Id.* at 9:53.

95.     Defendant Hartung then shifted to a third justification, suggesting the charges were because Mrs. Hinners was "grandstand[ing]."

96.     Council routinely permits speakers to "grandstand" during the public-comment period. None of those people were speaking about secret payments to Mr. White, and none of them were ejected from the meeting, arrested, or prosecuted for their speeches.

97.     Although the First Amendment would have permitted her to do so, Mrs. Hinners did not "grandstand."

98.     Defendant Hartung then shifted to a fourth justification, suggesting the charges were because Mrs. Hinners had turned around during her speech.

99.     Council routinely permits speakers to turn around during the public-comment period. From January 23, 2018, through January 8, 2019, Council had permitted "turning and talking" by speakers at least 13 times. None of those people were speaking about secret payments to Mr. White, and none of them were ejected from the meeting, arrested, or prosecuted for their speeches.

100.    The officers followed the mayor's orders. They grabbed Mrs. Hinners by the arms, pulled her out of the chair where she was sitting next to her son, threw her against a wall, handcuffed her, and marched her from Council chambers.[43]

101.    Seconds after ordering Mrs. Hinners removed, Defendant Hartung continued conducting the meeting.

102.    Mrs. Hinners did not return to the public portion of the meeting, which ended on schedule around 7:45 p.m.

103.    Council then moved into an executive session. Neither Mrs. Hinners nor anyone else caused any disruption to the executive session, and the meeting adjourned as scheduled around 8:20 p.m.

---

[43] *Id.* at 10:23.

104.    By that time, Council had conducted all the business it had on the agenda for the night.

105.    After the meeting, Defendant Hartung shifted to a fifth justification for having Mrs. Hinners

charged. He told the *Sandusky Register* that Mrs. Hinners was being prosecuted because "she chose to

ignore the rules" for the public-comment portion of its meetings.[44]

106.    City Council does not have rules for the public-comment portion of its meetings.

### City officials dust off a never-before-used ordinance to prosecute Mrs. Hinners; the citizens call shenanigans.

107.    The police held Mrs. Hinners in a booking room for nearly half an hour before issuing her a

complaint charging her with disturbing a lawful meeting in violation of Huron Codified Ordinance

§ 509.04.[45]

108.    The Huron Police Department had not classified any incident as a violation of

H.C.O. § 509.04 in at least 10 years before it filed charges against Mrs. Hinners.[46] Besides Mrs.

Hinners, no one has been charged with violating H.C.O. § 509.04 in the 20-plus years since the City

began keeping electronic court records.[47] On information and belief, no one other than Mrs.

Hinners has *ever* been charged under that ordinance.

109.    The people of Huron—who know Defendant Hartung and how much latitude he usually

allows speakers at Council meetings—immediately recognized the pretextual nature of the

prosecution and protested against his mistreatment of Mrs. Hinners. After being dragged in the

press and social media, Defendant Hartung was nowhere to be found for the next council meeting,

where citizens packed the house to demand that the City stop the retaliation. Speakers at the

---

[44] Andy Ouriel, *Huron mayor defends decision to remove resident from council meeting*, Sandusky Register (May 15, 2019), http://www.sanduskyregister.com/story/201905150006 (attached as Ex. K).

[45] Complaint, *State v. Hinners*, No. 19-CRB-126BC, Huron Muni. Ct. (May 14, 2019) (attached as Ex. D-1).

[46] Lippert e-mail to Bardwell, 5 (Oct. 7, 2019) (attached as Ex. D-46).

[47] Ortega e-mail to Gillombardo (attached as Ex. E-2).

meeting reminded Council about the importance of the work Mr. and Mrs. Hinners do to keep the community informed and called out the nakedly political motivation for pursuing charges:[48]

a.      Monty Tapp—now Huron's vice mayor—called council's actions "an embarrassment."

b.      Cheryl Zimmerman said Mr. and Mrs. Hinners "should have been thanked by Council for their research and advice."

c.      Maria Fry objected to Council's handling of various issues and to the fact that "Ms. Hinners was targeted for bringing some of these issues to light."

d.      Mary Murphy objected to Council filing charges based on guidelines that have "not been universally enforced."

e.      Pamela Snell said "the constitutional rights of Ms. Hinners were violated … due to her pursuit for the truth, criticism of the process, and lack of transparency on several topics which she brought to light."

f.      Meredith Miller said "the actions taken were done to embarrass Ms. Hinners and infringed her freedom of speech."

g.      Steve Fisher said the arrest was "an overreaction and a setup," noting that "inconsistent rules have been applied."

h.      Christy Jones was "appalled at the actions of council and the treatment of Ms. Hinners."

i.      Tony Legando said it was clear Mrs. Hinners was being prosecuted "due to the content of her message."

---

[48] Minutes of May 28, 2019 meeting, 1–3 (attached as Ex. D-42).

      j.     Mark Claus noted that he had "never seen the three-minute time limit strictly enforced" and that "the action taken was retaliatory due to the content of the comments made by Ms. Hinners."

110.   Mrs. Hinners had not violated H.C.O. § 509.04. There was no probable cause to believe Mrs. Hinners had violated H.C.O. § 509.04.

111.   Citizens routinely engage in the same behavior that Mrs. Hinners engaged in at the May 14 meeting.

112.   For instance, audience members who give speeches about topics other than Council making secret, backroom payments to Mr. White regularly speak from somewhere other than the lectern without being arrested. They include the following:

      a.  Beth Fisher at the January 9, 2018, meeting;

      b.  Gina Woody at the January 9, 2018, meeting;

      c.  Gordon Hahn twice, at the January 9, 2018, meeting;

      d.  Steve Fisher twice at the January 9, 2018, meeting;

      e.  Sandy Legando three times, at the January 9, 2018, meeting;

      f.  Steve Fisher at the January 23, 2018, meeting;

      g.  Tony Legando at the April 24, 2018, meeting;

      h.  Robert Forney Jr. at the April 24, 2018, meeting;

      i.  Phyllis Wassner at the May 22, 2018, meeting;

      j.  Paul Hanny at the October 9, 2018 meeting;

      k.  Steve Fisher at the October 9, 2018 meeting;

      l.  Unidentified audience members at the November 27, 2018 meeting; and

      m.  Scott Schlessman at the November 27, 2018 meeting.

113.   Similarly, many audience members regularly turn to face the audience without being arrested when they discuss topics other than Council making secret payments to Mr. White. They include:

      a.   Paul Hanny at the January 23, 2018, meeting;

      b.   Steve Fisher at the January 23, 2018, meeting;

      c.   Kyle Orten at the January 23, 2018, meeting;

      d.   Shannon Pollack at the February 27, 2018, meeting;

      e.   Glen Szatala at the April 24, 2018, meeting;

      f.   Beth Fisher at the April 24, 2018, meeting;

      g.   Gina Woody at the April 24, 2018, meeting;

      h.   Tony Legando at the April 24, 2018, meeting;

      i.   Shannon Pollack at the May 22, 2018, meeting;

      j.   Judy Tann at the December 11, 2018 meeting;

      k.   Rebekah Cupp at the January 8, 2019, meeting;

      l.   Mary Kay Schlessman at the January 8, 2019, meeting; and

      m.  Sandy Legando at the January 8, 2019, meeting.

114.   And speakers are regularly allowed to exceed the supposed time limit on speeches without being arrested when they give speeches about topics other than Council making secret payments to Mr. White. They include:

      a.   Kyle Orten at the January 23, 2018, meeting;

      b.   Tony Legando at the January 23, 2018, meeting;

      c.   Pete Schade at the January 23, 2018, meeting;

      d.   Beth Fisher at the January 23, 2018, meeting;

      e.   Steven Fisher at the February 11, 2018 meeting;

      f.   Tony Legando at the February 11, 2018 meeting;

g.  Bill Scott at the February 27, 2018, meeting;

h.  Stacy Hinners at the February 27, 2018, meeting (not talking about secret payments to Mr. White);

i.  Steve Fisher at the February 27, 2018, meeting;

j.  Beth Fisher at the February 27, 2018 meeting;

k.  Shannon Pollack at the February 27, 2018, meeting;

l.  Beth Fisher at the March 27, 2018 meeting;

m.  Shannon Pollack at the March 27, 2018 meeting;

n.  Tony Legando at the March 27, 2018 meeting;

o.  Gina Woody at the April 10, 2018 meeting;

p.  Julie Spitzley at the April 24, 2018, meeting;

q.  Glen Szatala at the April 24, 2018, meeting;

r.  Gina Woody at the April 24, 2018, meeting;

s.  Tony Legando at the May 22, 2018, meeting;

t.  Steve Fisher at the May 22, 2018, meeting;

u.  Lori Legando at the May 22, 2018, meeting;

v.  Bob Howell at the May 22, 2018, meeting;

w.  Robert Smith at the May 22, 2018, meeting;

x.  Shannon Pollack at the May 22, 2018, meeting;

y.  Beth Fisher at the May 22, 2018, meeting;

z.  Dr. Brian Murphy at the May 22, 2018, meeting;

aa.  Stacy Hinners at the October 9, 2018 meeting (not talking about secret payments to Mr. White);

bb.  Shannon Pollack at the October 9, 2018, meeting;

cc.  Jason Hinners at the November 27, 2018, meeting;

dd. Cathy Ramey at the November 27, 2018, meeting;

ee.  Scott Schlessman at the November 27, 2018, meeting;

ff.  Dennis Muratori at the November 27, 2018 meeting;

gg. Shawn Bickley at the December 11, 2018, meeting;

hh. Jason Hinners at the December 20, 2018, meeting;

ii.   Mac Lehrer at the December 20, 2018, meeting;

jj.   Bob Howell at the December 20, 2018, meeting;

kk. Lori Suter at the January 8, 2019, meeting;

ll.   Shaun Bickley, twice, at the January 8, 2019, meeting;

mm.     Rebekah Cupp at the January 8, 2019, meeting;

nn. Scott Schlessman at the January 8, 2019, meeting;

oo. Sandy Legando at the January 8, 2019, meeting;

pp. John Zimmerman at the February 12, 2019, meeting;

qq. Chuck Allendorf at the February 12, 2019, meeting;

rr.  Joe Catri at the February 12, 2019, meeting;

ss.  Stacy Hinners at the February 12, 2019 meeting (not talking about secret payments to
      Mr. White);

tt.  Jason Hinners at the February 12, 2019 meeting;

uu. Jason Hinners at the March 26, 2019 meeting;

vv. Kyle Wright at the April 23, 2019 meeting;

115.   Other people similarly situated to Mrs. Hinners have not generally been prosecuted because
of the conduct forming the basis of the charge against her.

116.    The City prosecuted Mrs. Hinners because she exercised her First Amendment rights to criticize City Council's secret payments and to petition the government for redress of that grievance.

117.    After learning that Mrs. Hinners had retained a defense attorney, police filed a new charge of resisting arrest (H.C.O. § 525.09) against Mrs. Hinners.[49]

118.    Mrs. Hinners hadn't been arrested. She had not and could not have violated H.C.O. § 525.09.

119.    There was no probable cause to believe Mrs. Hinners had violated H.C.O. § 525.09.

**Defendant Lane acknowledges the conflict barring her from handling the Hinners matter; she seizes control anyway.**

120.    Defendant Lane recognized that her role as a witness in the Hinners case—and her and her firm's exposure to civil and criminal liability as a result of Mrs. Hinners's arrest—presented a conflict of interest that required her to withdraw from any involvement in the handling of the case.

121.    Defendant Lane nonetheless attempted to assert control over the case.

122.    Defendant Lane purported to recuse herself from involvement, notifying defense counsel that she was "preparing a motion to file with the court to have a special prosecutor appointed for this case."[50] On information and belief, Lane directed Mr. Kaufman to recuse himself, as well, on the theory that he reported to a conflicted attorney. At a minimum, she bypassed his customary role with the City so she could control the appointment of a prosecutor who would be loyal to her.

123.    Mr. Kaufman did withdraw from the case.

124.    But Defendant Lane did not file a motion to have the court select and appoint an independent special prosecutor.

---

[49] Second complaint, *State v. Hinners*, No. 19-CRB-126BC, Huron Muni. Ct. (May 16, 2019) (attached as Ex. D-2).

[50] Lane e-mail to Chandra (May 17, 2019) (attached as Ex. D-21).

125.    Instead, she personally shopped around for an assistant prosecutor who would prosecute Mrs. Hinners for her.

126.    Director Lane first hired Wayne Nicol.[51] But Nicol, the City of Vermilion's prosecutor, has close ties with Lane's firm, Walter Haverfield, where his Vermillion *co-prosecutor*,[52] Sara Fagnilli, is an associate.[53] He also works day-in-day-out with Chris Hartung, Vermillion's police chief[54] and the brother of Defendant Hartung.

127.    Lane terminated Mr. Nicol's appointment immediately after the press caught on to the obvious conflicts.

128.    Lane quickly looked for a new assistant to obtain a conviction against Mrs. Hinners. On May 23, 2019, she hired Defendant O'Shea, a personal-injury and DUI-defense attorney who also works part-time for the City of Rocky River, which has also contracted with Walter Haverfield for legal services.

### Despite a trail of information signaling problems, Defendants Lane, Walter Haverfield, and the City hire Defendant O'Shea as a contract prosecutor.

129.    Defendants Lane, Walter Haverfield, and the City hired O'Shea negligently and recklessly, despite readily available information about his background that would suggest that he had every motive and inclination to disregard her constitutional rights in return for personal, financial gain, and was ethically challenged at best.

130.    The Internal Revenue Service, the Ohio Department of Taxation, and the Cuyahoga County Clerk of Courts have been forced to file tax liens against Defendant O'Shea to secure their debts against him.

---

[51] Lane letter to Ortega (May 21, 2019), (attached as Ex. D-22).
[52] Vermilion Municipal Court information (attached as Ex. D-30).
[53] Sara Fagnilli profile (attached as Ex. D-31).
[54] Vermilion Police Department information (attached as Ex. D-32).

131. The Ohio Supreme Court sanctioned Defendant O'Shea in 1996 for failing to adhere to its requirements for continuing legal education.

132. The Ohio Supreme Court sanctioned Defendant O'Shea again in 2002 for failing to adhere to its requirements for continuing legal education.

133. Defendant O'Shea's campaign tactics in the 2016 Democratic primary for a seat on the Cuyahoga County Domestic Relations Court led the administrative judge of that court to write a letter of ethical complaint to Chief Justice Maureen O'Connor, alleging that Defendant O'Shea was misleading voters and addressing the possibility of a violation of the Code of Judicial Conduct.

134. All this information about O'Shea's ethical and financial problems was readily available online to anyone who cared to run a simple background check on Defendant O'Shea.[55]

135. Lane offered that Walter Haverfield would pay O'Shea $150 an hour to prosecute Mrs. Hinners. Again, she claimed the delegation was "made pursuant to R.C. 2938.13."[56]

136. Because council and the City were the "complaining witnesses" in a case involving alleged disruption of a council meeting, Ohio Rev. Code § 2983.13 explicitly prohibited O'Shea from prosecuting Mrs. Hinners: "[T]he magistrate or judge shall not permit prosecution of any criminal case by private attorney employed or retained by a complaining witness."

137. Despite Defendant Lane's May 17 email stating that she would apply to the Court for an appointment, she did not do so for Defendant O'Shea, either. Under the delegation, Defendant

---

[55] *See, e.g.,* C. Ellen Connally & Mansfield Frazier, *You Be the Judge – Can Michael O'Shea Be Trusted on the Bench?* CoolCleveland.com (Feb. 20, 2016), https://coolcleveland.com/2016/02/you-be-the-judge-can-michael-oshea-be-trusted-on-the-bench-by-mansfield-frazier-c-ellen-connally/; Tom Meyer, *Investigator: Prosecutor owing back taxes belongs to yacht club*, WKYC-TV (December 4, 2013), https://www.wkyc.com/article/news/investigations/investigator-prosecutor-owing-back-taxes-belongs-to-yacht-club/316837773.
[56] Lane letter to Ortega (May 23, 2019) (attached as Ex. D-3).

O'Shea submitted bills for his services to be approved by Defendant Lane at Walter Haverfield, not by the City.[57]

138.    The Huron City Charter prohibits city officers from entering a contract "to expend any money or incur any liability … on behalf of the city for any purpose in excess of the amounts appropriated for such expenditures and obligations."[58]

139.    Huron City Council did not authorize Lane to contract to expend any money or incur any liability on behalf of the City to pay Defendant O'Shea.

140.    Despite her conflict, Defendant Lane approved and caused the City to pay Defendant O'Shea's fees and expenses.

141.    Lane also continued overseeing Defendant O'Shea's handling of the case.

142.    Defendants Lane and O'Shea discussed filings in the case, case strategy, and possible plea bargains.[59]

143.    Defendant O'Shea's collaboration with Lane was not intimately associated with the judicial phase of the criminal process.

144.    On information and belief, beginning July 1, 2019, Defendant O'Shea began coordinating directly with the City's civil-defense firm, Fishel Downey Albrecht & Riepenhoff LLP, as well.

145.    Defendant O'Shea's collaboration with the City's civil defense firm was not intimately associated with the judicial phase of the criminal process.

---

[57] *See* Lipson O'Shea invoice to "City of Huron, c/o Walter Haverfield" (Jul. 1, 2019) (attached as Ex. D-44).

[58] Huron City Charter § 5.07.

[59] *See id.* at 2 (reflecting 0.3 hours for "Email correspondence with Aimee W. Lane . . . and TC re witness issue." and another 0.1 hours for "Email correspondence with [Aimee Lane]").

146.    And Defendant O'Shea's collaboration with the City's civil-defense firm was all part of an effort by Defendants to improperly and unethically leverage the criminal process against Mrs. Hinners solely for civil advantage.

147.    The last time the City needed a special prosecutor, the law director did not make that decision, select the prosecutor, supervise the prosecutor, or coordinate with the prosecutor.

148.    The last time the City needed a special prosecutor, the law director did not offer him payment, provide him payment, or otherwise provide him any financial incentive to churn the case.

149.    The routine practice in courts throughout Ohio is for a special prosecutor to accept assignments dealing with petty offenses such as the Hinners matter as a matter of mutual governmental aid, neither asking for nor accepting payment, with the understanding that they will receive the same benefit when a conflict prevents them from handling one of their own community's cases.

### The Erie County Court of Common Pleas appoints a special prosecutor to investigate criminal interference with Mrs. Hinners's civil rights.

150.    On May 30, 2019, Mrs. Hinners reported to Erie County Prosecutor Kevin Baxter that Defendant Hartung, Defendant Lane, and other officials acting on behalf of the City of Huron were conspiring to interfere with her civil rights and committing numerous other criminal offenses in the process of prosecuting her.[60]

151.    Prosecutor Baxter recused himself and his office from the case because he used to be Mr. Hinners's employer. Following the proper procedure for dealing with a prosecutor's conflict of interest, he referred the matter to the Erie County Court of Common Pleas to request the appointment of a special prosecutor.

---

[60] Chandra letter to Baxter (May 30, 2019) (attached as Ex. A-13); Chandra letter to Baxter (Jun. 19, 2019) (attached as Ex. A-14).

152.    That request sought a special prosecutor to handle the "Investigation of S. Hinners."

153.    The court granted that request and entered an order appointing Attorney General Dave Yost to handle the case.[61]

154.    Attorney General Yost assigned the matter to his office's Special Prosecutions Section. Assistant Attorney General Stephanie Anderson assigned the Bureau of Criminal Investigation to investigate the conspiracy. That investigation is ongoing and could end at any time.

### Defendant O'Shea joins the City's harassment of Mr. and Mrs. Hinners without being properly appointed as a prosecutor. None of his actions are authorized by law.

155.    Defendant O'Shea was never properly appointed to serve as a prosecutor in Mrs. Hinners's case, and none of his actions were taken at the behest of a properly appointed prosecuting authority. At all times relevant to this case, he has been a private attorney acting under color of state law.

156.    The City of Huron has bifurcated the authority statutorily vested in a municipal "Director of Law."

157.    It has an appointed director of law, generally responsible for all civil matters. On April 9, 2019, the City through its Council appointed Defendants Lane and Walter Haverfield to provide those services.

158.    The City also has an appointed prosecutor, generally responsible for all criminal matters.

159.    On May 22, 2018, the City through its City Council appointed Michael Kaufman to provide services as "Prosecuting Attorney."

160.    The director of law and the prosecutor under the City's system operate independently. Neither is subordinate to the other.

---

[61] Judgment Entry, Case No. 2019-MS-92 (Erie C.P.) Aug. 28, 2019 (attached as Ex. A-15).

161.    Under this system, Defendant Lane had no contractual responsibility for or legal authority over prosecution decisions.

162.    Under Defendant Walter Haverfield's contract with the City, Defendant Lane was to provide "routine services," which are limited to attending meetings, drafting and reviewing documents, and providing legal research and advice.[62] The contract specifically excludes litigation as "outside the scope" of the firm's contract with the City—and requires a special agreement between the parties for litigation.[63]

163.    The City never reached an agreement authorizing Defendant Lane to become involved in the litigation of the criminal charges against Mrs. Hinners.

164.    Before the Hinners case, Defendant Lane was never involved in any prosecutorial decisions.

165.    The City's contract with Walter Haverfield also specifically provides that Walter Haverfield LLP's duties are non-delegable absent the City's express authority: "This agreement may not be assigned or transferred in whole or in part by either Party without the written consent of the other. Any purported assignment without the express written consent of the other is void."

166.    The City never gave Defendant Lane authority over the prosecution of Mrs. Hinners or anyone at all.

167.    Council never approved or authorized any official to approve Defendant Lane's calculated "delegation" of the prosecution to Defendant O'Shea.

168.    The decision about whether to proceed with the charges against Mrs. Hinners properly remained with Prosecutor Michael Kaufman, who handles all criminal matters in the Huron

---

[62] City of Huron–Walter Haverfield engagement agreement (Apr. 11, 2019) (attached as Ex. D-36).
[63] *Id.*

Municipal Court. The City was clear when entering into its contract with Defendant Walter Haverfield that "Mr. Kaufman would remain Prosecutor for the city."[64]

169.    Because Defendant Lane had no authority to prosecute Mrs. Hinners, and she and her firm had no delegation authority from the City, she could not delegate that authority to Defendant O'Shea.

170.    The law director does not have the authority to appoint a special prosecutor. Shortly after the City embarked on its prosecution of Mrs. Hinners, Defendant White acknowledged in an e-mail to Council member Joe Dike that the decision to appoint a special prosecutor for a conflict of interest rests with the prosecutor.

171.    When an attorney has a conflict of interest preventing her from prosecuting a criminal case, the proper procedure is not to hire and supervise an assistant but to notify the court of the conflict and move for the appointment of a special prosecutor.

172.    Acknowledging her conflict of interest, Defendant Lane said in a May 17, 2019, e-mail to Mrs. Hinners's counsel that she would move for the appointment of a special prosecutor.

173.    Unlike Prosecutor Baxter, Defendant Lane never followed through on that promise. Instead, to better engineer a retaliatory prosecution against Mrs. Hinners, she unilaterally contracted with Defendant O'Shea to act as her assistant in prosecuting Mrs. Hinners.

174.    The Ohio Attorney General's authority to investigate and prosecute Mrs. Hinners supersedes any authority Defendant O'Shea has to investigate and prosecute Mrs. Hinners.

175.    Ohio Rev. Code § 3.22 and Huron City Charter 12.01 required O'Shea, like all other municipal officers, to take and subscribe an oath of office before carrying out any of his duties.

176.    Defendant O'Shea never took the oath of office.

---

[64] Minutes of April 9, 2019 meeting, 2 (attached as Ex. D-35).

177. By charter, the City prohibits its officers from contracting to spend money or incur liability in excess of the amounts appropriated for such expenditures or obligations.

178. Defendant O'Shea was statutorily barred from prosecuting Mrs. Hinners because he was employed or retained by the complaining witness.

179. Defendant O'Shea was not eligible to serve as prosecutor because his contract was approved in violation of the charter ordinance prohibiting the City from incurring any liability in excess of the amount appropriated by City Council.

180. Because the City tended to none of the formalities in contracting to prosecute Mrs. Hinners, Defendant O'Shea has no claim to absolute prosecutorial immunity or to qualified immunity.[65]

181. Mrs. Hinners is therefore free to seek damages and equitable relief against Defendant O'Shea, in his official capacity and in his individual capacity.[66]

### Lane continues to interfere with the City's handling of the case; Council ratifies Defendant Hartung's order to prosecute Mrs. Hinners.

182. At the July 9, 2019, meeting of Huron City Council, Council member Sam Artino proposed that City Council, as the "victim" of Mrs. Hinners's purported crime, pass a resolution declining to press charges against her or asking Defendant O'Shea to drop the charges.[67]

183. Mr. Artino then formally made a motion for Council to seek an end to the charges against Mrs. Hinners.

184. Another member seconded that motion.[68]

---

[65] *Cooper v. Parrish*, 203 F.3d 937, 950–51 (6th Cir. 2000) (denying immunity to "special" assistant district attorney who participated in conspiracy to violate Plaintiff's First Amendment rights without taking the oath of office and whose appointment was otherwise contrary to law).

[66] *Faith Baptist Church v. Waterford Twp.*, 522 F. App'x 322, 328 (6th Cir. 2013) (reversing dismissal of individual-capacity claims against prosecutor who participated in selective enforcement based on Plaintiff's First Amendment–protected activity).

[67] Minutes of July 9, 2019 meeting, 6–7 (attached as Ex. D-45).

[68] *Id.*

185.     Despite her acknowledged conflict of interest, Lane interjected herself into the discussion. She sought to dissuade Council from approving such a motion. She told Council it would have no effect and intimated—falsely—that it could be illegal.

186.     Defendant Lane's advice was self-serving.

187.     On Lane's advice, Council—the purported victim of Mrs. Hinners's purported "crimes"—declined to request the discontinuation of the prosecution of Mrs. Hinners and formally state that it did not want to press charges.[69]

188.     Council's vote to let Defendant O'Shea continue working to convict Mrs. Hinners reconfirmed that it was the City's official policy to prosecute Mrs. Hinners.

**Defendant O'Shea wields prosecutorial power without regard for the First Amendment, protecting his conflicted employer instead of administering justice.**

189.     Based on the video evidence available from the time he was contracted, Defendant O'Shea knew from the outset that the prosecution of Mrs. Hinners lacked merit.

190.     Word of Defendant O'Shea's mishandling of the Hinners matter quickly spread through the legal community. Outraged by his disregard for the First Amendment, several attorneys petitioned the government for a redress of grievances, urging Defendant O'Shea to drop all the charges against Mrs. Hinners.

191.     Allergic to First Amendment–protected activity, Defendant O'Shea admonished the protesters, telling them that it was "imperative" that they not speak to him while he was investigating the facts. "[C]ontacting me directly about an ongoing investigation and/or pending criminal investigation is not appropriate," he wrote.

192.     When a prosecutor is abusing his authority, contacting him directly about a pending criminal investigation is not merely "appropriate"—it is our civic duty. And constitutionally protected.

---

[69] *Id.*

193.     On July 3, 2019, Defendant O'Shea wrote to Mrs. Hinners's attorneys. He conceded that there was no probable cause to support charging Mrs. Hinners with resisting arrest "because she was not being arrested."[70]

194.     Defendant O'Shea offered to abandon the entire criminal prosecution if Mrs. Hinners would stipulate that her arrest was supported by probable cause. If she refused, he threatened to add a new charge of obstructing official business (H.C.O. § 525.07) and take the case to trial.[71]

195.     Seeking a stipulation regarding probable cause—which was non-existent—served no legitimate prosecutorial purpose. It was unethical.[72]

196.     O'Shea's demand for the stipulation was intended solely to protect Lane, her law firm, and other City officials from liability.

197.     Mrs. Hinners declined to make the false stipulation Defendant O'Shea demanded.

198.     Defendant O'Shea followed through on his threat. He directed a member of the Huron Police Department to charge Mrs. Hinners under H.C.O. § 525.07.[73]

199.     Defendant O'Shea's advice and directions to the police were not intimately associated with the judicial phase of the criminal process.[74]

200.     Mrs. Hinners had not violated H.C.O. § 525.07. There was no probable cause to believe Mrs. Hinners had violated H.C.O. § 525.07.

---

[70] O'Shea e-mail to Chandra (July 3, 2019) (attached as Ex. D-24).

[71] *Id.*

[72] Supreme Court of Ohio Board of Commissioners on Grievances and Discipline, OH Adv. Op. 94-10 ("When a prosecutor becomes aware that a criminal action lacks merit, it is improper … to offer to dismiss the criminal charge in exchange for the defendant's promise to sign a release of all civil claims.").

[73] Third complaint, *State v. Hinners*, No. 19-CRB-126BC, Huron Muni. Ct. (July 23, 2019) (attached as Ex. D-6).

[74] *Burns v. Reed*, 500 U.S. 478, 496 (1991) ("respondent has not met his burden of showing that the relevant factors justify an extension of absolute immunity to the prosecutorial function of giving legal advice to the police.").

201.    Citizens frequently decline to speak to Huron police officers who approach them for voluntary interviews. The police do not usually seize them and prosecute them for failing to consent to voluntary interviews.

202.    The City prosecuted Mrs. Hinners based on her exercise of her First Amendment rights to criticize City Council's secret payments and to petition the government for redress of that grievance.

203.    As a prosecutor, Defendant O'Shea is required to dismiss charges that are not supported by probable cause.

204.    Instead of dismissing the unsupported resisting-arrest charge, Defendant O'Shea used it as a bargaining chip on the obstruction charge: If Mrs. Hinners would waive her right to a speedy trial on the new charge and enter a written plea to that charge, saving him the time and expense of a trip to court, the state would move to dismiss the resisting charge at the City's cost "[o]nce this new charge is docketed."[75]

205.    Mrs. Hinners agreed to the deal, but when she filed her waiver and plea, Defendant O'Shea did not drop the resisting-arrest charge.

206.    Through counsel, Mrs. Hinners notified Defendant O'Shea of the stress the resisting-arrest charge was causing her and repeatedly requested a prompt dismissal of the charge.

207.    Defendant O'Shea allowed the resisting-arrest charge to hang over Mrs. Hinners's head for months beyond when he concluded it was not supported.

---

[75] O'Shea e-mail to Chandra (July 31, 2019) (attached as Ex. D-25).

**Defendant O'Shea knows he is being used to retaliate against Mrs. Hinners.**
**He refuses to dismiss the case.**

208.    Defendant O'Shea shifted, on the City's behalf, to yet a sixth justification for the charges against Mrs. Hinners, saying it was her entire course of conduct at the May 14, 2019 meeting, including her declining to talk to the police officers who tried to question her.[76]

209.    Defendant O'Shea was aware that Mrs. Hinners was being prosecuted for conduct that the City routinely permits from citizens who are not suing it for making secret payments to its executives.

210.    Defendant O'Shea possessed dozens of hours of video and audio evidence demonstrating that everything Defendant Hartung had accused her of was normal behavior at Council meetings.

211.    Defendant O'Shea also solicited written statements from City officials who were present at the meeting. Defendants Hartung,[77] Schaffter,[78] White,[79] Ginesi,[80] and Hardy[81] each provided a statement, as did Clerk of Council Christine Gibboney.[82]

212.    Defendant O'Shea's involvement in obtaining those statements was not intimately associated with the judicial phase of the criminal process.[83]

213.    Each of their narratives contained false statements about the interactions between Mrs. Hinners and Defendant Hartung, lending support to the various false justifications Defendant Hartung had offered as bases for the charges against Mrs. Hinners.

---

[76] Chandra Decl. at ¶ 12 (attached as Ex. A).

[77] Hartung statement (May 15, 2019) (attached as Ex. D-11).

[78] Schaffter statement (June 27, 2019) (attached as Ex. D-13).

[79] White statement (June 27, 2019) (attached as Ex. D-14).

[80] Ginesi statement (July 1, 2019) (attached as Ex. D-16).

[81] Hardy statement (July 2, 2019) (attached as Ex. D-17).

[82] Gibboney statement (July 1, 2019) (attached as Ex. D-15).

[83] *Buckley v. Fitzsimmons*, 509 U.S. 259, 260 (1993) ("If performed by police officers and detectives, such [investigative] actions would be entitled to only qualified immunity; the same immunity applies to prosecutors performing those actions.")

a.      Defendants Hartung, Ginesi, and Hardy falsely reported that Defendant Hartung had instructed Mrs. Hinners to "turn around" or "face the council." As the recordings show, Defendant Hartung never instructed Mrs. Hinners to turn around or to face council.

b.      Defendants Hartung, Schaffter, and White falsely reported that Defendant Hartung repeatedly directed Mrs. Hinners to step to the podium. As the recordings show, Defendant Hartung asked Mrs. Hinners to step to the podium only once.

c.      Defendants Hartung, Schaffter, and White falsely reported that Mrs. Hinners ignored Defendant Hartung's request to step to the podium. As the video recordings show, Mrs. Hinners complied with that request without question.

214.    Defendant O'Shea knew from reviewing the video and audio evidence that those witness statements were false.

215.    Defendant O'Shea's knowledge that he was facilitating a selective prosecution required him to dismiss the case. He did not.

216.    On September 6, 2019, Mrs. Hinners filed a motion to dismiss the prosecution based on selective prosecution in retaliation of her exercise of her First Amendment rights, as well as other First and Fifth Amendment violations.

217.    In his written response of September 18, Defendant O'Shea never disputed any of the facts supporting Mrs. Hinners's selective-prosecution defense. Nor did he offer any supplemental facts or observations about the citizen-comparators Mrs. Hinners offered that would justify the City's unequal treatment.

218.    On October 2, 2019, the Huron Municipal Court held a brief conference in chambers on Mrs. Hinners's motion to dismiss. Although it had binding authority requiring her defenses to be decided pretrial, the court said it would leave them to the jury.

219.     Despite that decision, the Huron Municipal Court scheduled a hearing for October 7, 2019, to consider whether Defendant O'Shea was selectively prosecuting Mrs. Hinners in violation of her First Amendment rights.

220.     On the last business day before the hearing, Defendant O'Shea reneged on stipulations as to various pieces of evidence central to Mrs. Hinners's selective-prosecution defense.

221.     Defendant O'Shea reneged on those stipulations in bad faith and solely to prevent the court from receiving evidence of the retaliatory nature of his prosecution.

**Defendant O'Shea cuts and runs—with a vow to return.**

222.     With the selective-prosecution hearing approaching, Defendant O'Shea attempted to find evidence to rebut the allegation of selective prosecution.

223.     By 1:30 p.m. on October 7—half an hour before the selective-prosecution hearing was scheduled to begin—Defendant O'Shea inquired into the discrepancy between the City's treatment of Mrs. Hinners and similarly situated speakers at City Council meetings.

224.     Alternatively, he was insufficiently concerned about selective prosecution to do so, willfully blinding himself to what was obvious.

225.     Defendant Hartung never provided O'Shea with a plausible explanation for the decision to target Mrs. Hinners without prosecuting any other citizens who engaged in similar behavior.

226.     Defendant Lane never provided O'Shea with a plausible explanation for the decision to target Mrs. Hinners without prosecuting any other citizens who engaged in similar behavior.

227.     No other witness provided O'Shea with a plausible explanation for the decision to target Mrs. Hinners without prosecuting any other citizens who engaged in similar behavior.

228.     Defendant O'Shea arrived for the hearing without having subpoenaed any witnesses to show that the prosecution was not selective and did not violate equal protection.

229.     Defendant O'Shea arrived for the hearing with no exhibits to enter into evidence.

230.    Defendant O'Shea huddled privately in a City Hall conference room with Defendant Lane and consulted her again about how he should proceed.

231.    To avoid adjudication of the constitutional defenses Mrs. Hinners raised, Defendant O'Shea filed a motion to dismiss without prejudice half an hour before the selective-prosecution hearing was scheduled to begin. Defendant O'Shea claimed he was dismissing the case because his key witnesses were under criminal investigation for interfering with Mrs. Hinners's civil rights in violation of Ohio Rev. Code § 2921.45—but he knew months earlier that Mrs. Hinners had initiated that investigation into that crime and others.

232.    Defendant O'Shea maintained falsely that Mrs. Hinners's charges were supported by probable cause. At his request, and over Mrs. Hinners's objection, the Court dismissed the charges *without* prejudice, leaving O'Shea free to refile them if the Ohio attorney general chose not to prosecute his witnesses.[84]

233.    The court also entered a decision rejecting Mrs. Hinners's First Amendment and selective-prosecution motions, based on the previous conference where it said—contrary to authority before the Court—it preferred to leave such defenses to the jury.[85]

234.    Denying Mrs. Hinners's motion without hearing her evidence left Mrs. Hinners with no meaningful opportunity to assert her constitutional right to a pretrial determination of her First Amendment and selective-prosecution defenses. The City is now permitted to refile the charges against her, but Ohio law and procedure no longer affords Mrs. Hinners any procedural mechanism entitling her to have her defense—founded in the U.S. Constitution—considered on the merits.

---

[84] Judgment Entry, *State v. Hinners*, No. 19-CRB-126BC, Huron Muni. Ct. (Oct. 7, 2019) (attached as Ex. D-10).

[85] Mrs. Hinners directed the Huron Municipal Court to on-point, controlling authority requiring pre-trial consideration of her First Amendment defenses, including *State v. Brown*, 6th Dist. Ottawa No. OT-95-040, 1996 WL 139626, *7 (defense of selective prosecution must be raised in pretrial motion.).

235.     After filing his motion to dismiss, O'Shea explicitly touted the possibility of charging Mrs. Hinners again, in court and in the press.[86]

236.     Defendant O'Shea's statements to the press were not intimately associated with the judicial phase of the criminal process.[87]

237.     Defendant O'Shea has not asked the court to dismiss the charges with prejudice.

238.     Defendant O'Shea has not notified Mrs. Hinners or her counsel that he will not refile the charges.

239.     Defendant O'Shea has taken no actions to indicate that he will not refile the charges.

240.     The City initiated the prosecution of Mrs. Hinners to harass her in retaliation for her exercise of her First Amendment rights. Defendant O'Shea pursued the prosecution in bad faith, and any attempt to prosecute Mrs. Hinners again would also be in bad faith.

### With Defendant Hartung and Defendant Ginesi out of office, their replacements refuse to reverse the damage done and avoid litigation.

241.     Since Defendant Hartung ordered the prosecution of Mrs. Hinners, the people of Huron have rallied around her, hounding City Council to reverse course and acknowledge the valuable contributions she makes to the City's civic life. In the face of this opposition, Defendant Hartung began skipping council meetings, attending only one more before resigning altogether.

242.     And, incensed by his attempts to weaponize the Church against Mr. Hinners, Huron's voters drummed Defendant Ginesi out of office on November 5, 2019, when they voted in a slate of three new, reform-minded candidates who have pledged to bring transparency to the City's operations.

---

[86] Michael Harrington, *Huron dismisses charges against Hinners*, Sandusky Register (Oct. 10, 2019), http://www.sanduskyregister.com/story/201910080010 (attached as Ex. L).

[87] *Buckley v. Fitzsimmons*, 509 U.S. 259, 260 (1993) ("Fitzsimmons' statements to the media also are not entitled to absolute immunity. There was no common-law immunity for prosecutor's out-of-court statements to the press, and, under *Imbler,* such comments have no functional tie to the judicial process just because they are made by a prosecutor.").

243. The new council has been sworn in and met multiple times since the election. Despite a request from Mrs. Hinners through counsel, it has not deviated from its official posture supporting the prosecution of Mrs. Hinners.

244. The prosecution and ongoing threat of prosecution have had and continue to have a chilling effect on Mrs. Hinners. The community continues to seek her out for insights, but not knowing what else might trigger a prosecution, Mrs. Hinners still has not spoken publicly about city business since police dragged her out of the May 14, 2019 meeting.

245. The prosecution and ongoing threat of prosecution have had and continue to have a chilling effect on Mrs. Hinners.

246. Mrs. Hinners has drafted a new post for The Talk of Huron. She is prepared to post it, but unwilling to do so until she knows that it will not trigger refiled charges or any other retaliation.

### Defendant O'Shea doubles down on his disregard for the First Amendment, threatening Mrs. Hinners with still more charges.

247. Consistent with her Sixth Amendment right, Mrs. Hinners hired counsel to defend her against the criminal charges Defendant O'Shea was pursuing against her.

248. After those charges were dismissed, the Hinnerses wanted to petition the government for the redress of her grievances.

249. To that end, the Hinnerses through counsel petitioned the government for redress of her grievances by asking Huron City Council to terminate the improper appointment of Defendant O'Shea and direct Prosecutor Michael Kaufman to file a motion to convert the dismissal of the charges to a dismissal with prejudice.

250. When that request was ignored, Mrs. Hinners through counsel petitioned the government for redress of her grievances by filing this civil action to prevent the refiling of charges against her.

251.    Through this suit, the Hinnerses seek a resolution that would preclude any further charges against her over the May 14, 2019 incident. Any settlement talks by the Hinnerses in that regard would be a petition for redress of grievances from the government.

252.    Defendant O'Shea—through his counsel—has falsely characterized Mrs. Hinners's communications regarding Defendant O'Shea's unsuitability for his ostensible government post as "obstruction of justice."[88]

253.    Defendant O'Shea—through his counsel—has further threatened that any attempt to settle the case on terms impacting O'Shea's $150-an-hour prosecution to be "a criminal attempt to obstruct justice."

254.    Through his threats, Defendant O'Shea is seeking to inhibit Mrs. Hinners from communicating with her government officials about matters of public concern—including the procedural deficiencies surrounding O'Shea's appointment and his subsequent prosecutorial misconduct—based on the content and viewpoint of those communications.

255.    Defendant O'Shea's threats of criminal charges were not intimately associated with the judicial phase of the criminal process.

**CLAIM 1**
**EQUAL PROTECTION VIOLATION, 42 U.S.C. § 1983**
**SELECTIVE ENFORCEMENT/SELECTIVE PROSECUTION**
**(BY PLAINTIFF STACY HINNERS AGAINST DEFENDANT CITY OF HURON, AGAINST DEFENDANTS HARTUNG, WHITE, AND LANE, IN THEIR INDIVIDUAL CAPACITIES, AND AGAINST DEFENDANTS LIPPERT, ORZECH, KOEHLER, AND O'SHEA, IN THEIR INDIVIDUAL AND OFFICIAL CAPACITIES)**

256.    Plaintiff incorporates all previous allegations.

257.    In opposing secret payments to Defendant White and engaging in other protected activity, Mrs. Hinners was exercising her clearly established constitutional and statutory rights.

---

[88] Kasson e-mail to Chandra (Jan. 30, 2020) (attached as Ex. A-16)

258.    Dozens of similarly situated people who have not opposed secret payments to Defendant White have engaged in the same kinds of conduct that prompted the charges against Mrs. Hinners. No one else has ever been charged for that conduct:

    a.    For instance, from January 9, 2018, through May 22, 2018, Council had permitted people to speak without approaching the podium at least 13 times.[89]

    b.    From January 23, 2018, through February 12, 2019, Council had permitted people to exceed the stated time limit at least 48 times.[90]

    c.    From January 23, 2018, through January 8, 2019, Council had permitted "turning and talking" by speakers at least 13 times.[91]

259.    None of those people were speaking about secret payments to Defendant White, and none of them were ordered to sit down, cut off from speaking, asked to leave, subjected to the use of force by police, handcuffed, ejected from the meeting, arrested, or prosecuted for their speeches.

260.    Defendants' purpose in prosecuting Mrs. Hinners was to retaliate for her exercise of her constitutional and statutory rights.

261.    Defendants' actions—on behalf of the City—violated Mr. and Mrs. Hinners's clearly established constitutional and statutory rights, and were unlawful in light of clearly established law. No reasonable person would have believed otherwise, given the state of the law and Defendants' motivations.

---

[89] *See* Ex. B-15 (compiling instances of guests at City Council meetings speaking without approaching the podium).

[90] *See* Ex. B-16 (compiling instances of guests at City Council meetings directly addressing the audience).

[91] *See* Ex. B-17 (compiling instances of guests at City Council meetings exceeding the three– or five–minute limit).

262.    As a direct and proximate result of Defendants' unlawful activity, Mr. and Mrs. Hinners have

suffered and continue to suffer economic and non-economic damages for which Defendants are

liable.

263.    Defendants' acts were willful, egregious, malicious, and worthy of substantial sanction to

punish and deter them and others from engaging in this type of unlawful conduct.

### CLAIM 2
### FIRST AMENDMENT RETALIATION, 42 U.S.C. § 1983—RETALIATORY ARREST/PROSECUTION
(BY PLAINTIFF STACY HINNERS AGAINST DEFENDANT CITY OF HURON; AGAINST
DEFENDANTS HARTUNG, WHITE, AND LANE, IN THEIR INDIVIDUAL CAPACITIES; AND
AGAINST DEFENDANTS LIPPERT, ORZECH, KOEHLER, AND O'SHEA, IN THEIR INDIVIDUAL
AND OFFICIAL CAPACITIES)

264.    Plaintiff incorporates all previous allegations.

265.    At all material times, Mr. and Mrs. Hinners were exercising their clearly established

constitutional and statutory rights, including the right to practice their religion consistent with their

sincerely held beliefs, the right to free speech, the right to freedom of the press, the right to

peaceably assemble, and the right to petition the government for redress of grievances.

266.    Defendants sought to unlawfully interfere with Mr. and Mrs. Hinners's exercise of their

clearly established rights through a series of adverse actions ("the Retaliation Campaign"), including,

but not limited to:

      a.  lodging criticisms of Mr. Hinners with his priest, Father McBeth;

      b.  discouraging Father McBeth from allowing Mr. Hinners to become a deacon;

      c.  shouting at Mrs. Hinners in a public meeting;

      d.  summoning the police in response to Mrs. Hinners's speech;

      e.  cutting her off before her time had expired;

      f.  threatening to charge her with disrupting a public meeting;

      g.  ordering her removed from the meeting;

      h.  critiquing her speech in front of her assembled neighbors;

    i.  charging her with disturbing a lawful meeting;

    j.  charging her with resisting arrest;

    k.  charging her with obstructing official business;

    l.  making knowingly false statements to the press about the charges against her;

    m. making knowingly false statements in connection with the prosecution of those charges;

    n.  refusing to drop the charges against Mrs. Hinners unless she said probable cause supported the charges against her;

    o.  attempting to dissuade the trial court from holding a constitutionally mandated hearing on her First Amendment defenses;

    p.  refusing to timely honor the bargain to dismiss the resisting-arrest charge against her;

    q.  refusing to stipulate to the authenticity of evidence whose authenticity was undisputed;

    r.  refusing to dismiss all charges with prejudice;

    s.  continuing to threaten further prosecution; and

    t.  accusing her of obstructing justice by petitioning City Council to redress her grievances by dismissing Defendant O'Shea.

267. Arresting Mrs. Hinners injured her and Mr. Hinners by restraining, preventing, and impairing their exercise of their rights, and did so in a way likely to chill a person of ordinary firmness from continuing to exercise those rights.

268. Defendants were motivated to charge and prosecute Mrs. Hinners based on her and her husband's exercise of her constitutional rights.

269. Defendants' actions—on behalf of the City—violated Mr. and Mrs. Hinners's clearly established constitutional and statutory rights, and were unlawful in light of clearly established law. No reasonable person would have believed otherwise, given the state of the law and Defendants' motivations.

270.     As a direct and proximate result of Defendants' unlawful activity, Mr. and Mrs. Hinners have suffered and continue to suffer economic and non-economic damages for which Defendants are liable.

271.     Defendants' acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter them and others from engaging in this type of unlawful conduct.

## CLAIM 3
### FIRST AMENDMENT RETALIATION, 42 U.S.C. § 1983—PRIOR RESTRAINT
(BY PLAINTIFFS STACY AND JASON HINNERS AGAINST DEFENDANT CITY OF HURON; AGAINST DEFENDANTS HARTUNG, WHITE, LANE, GINESI, AND SCHAFFTER, IN THEIR INDIVIDUAL CAPACITIES; AND AGAINST DEFENDANTS HARDY, LIPPERT, ORZECH, KOEHLER, AND O'SHEA, IN THEIR INDIVIDUAL AND OFFICIAL CAPACITIES)

272.     Plaintiff incorporates all previous allegations.

273.     "[P]rior restraints on speech and publication are the most serious and the least tolerable infringement on First Amendment rights."[92]

274.     Prior restraints can take many forms, including court orders,[93] statutes,[94] or even "informal procedures undertaken by officials and designed to chill expression."[95]

275.     Some prior restraints are explicit.[96] But more subtle governmental action, such as an ordinance allowing a ban on news racks on the sidewalks, can be a prior restraint.[97]

---

[92] *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976).

[93] *New York Times Co. v. United States*, 403 U.S. 713, 715 (1971) (court order preventing "publication of information whose disclosure would endanger the national security" is a "flagrant, indefensible, and continuing violation of the First Amendment.")(Black, concurring).

[94] *Near v. State of Minnesota ex rel. Olson*, 283 U.S. 697, 723 (1931) (Statute prohibiting publication of "malicious, scandalous and defamatory matter" is a prior restraint and "an infringement of the liberty of the press guaranteed by the Fourteenth Amendment.").

[95] *Multimedia Holdings Corp. v. Circuit Court of Fla., St. Johns Cty.*, 544 U.S. 1301, 1306 (2005).

[96] *New York Times Co.*, 403 U.S. at 715 (court order preventing "publication of information whose disclosure would endanger the national security" is a "flagrant, indefensible, and continuing violation of the First Amendment.")(Black, concurring).

[97] *City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 757 (1988) ("[A] licensing statute placing unbridled discretion in the hands of a government official or agency constitutes a prior restraint.").

276.    As in this case, threats of criminal prosecution can also effect a prior restraint.[98]

277.    At all material times, Mrs. Hinners was engaged in constitutionally protected activity.

278.    Defendants sought to effect unlawful prior restraints on Mr. and Mrs. Hinners by executing the Retaliation Campaign to chill them from engaging in protected activity.

279.    The Retaliation Campaign injured Mr. and Mrs. Hinners by restraining, preventing, and impairing their exercise of their rights, and did so in a way likely to chill a person of ordinary firmness from continuing to exercise those rights.

280.    Defendants' actions—on behalf of the City—violated Mr. and Mrs. Hinners's clearly established constitutional and statutory rights, and were unlawful in light of clearly established law. No reasonable person would have believed otherwise, given the state of the law and Defendants' motivations.

281.    As a direct and proximate result of Defendants' unlawful activity, Mr. and Mrs. Hinners have suffered and continue to suffer economic and non-economic damages for which Defendants are liable.

282.    Defendants' acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter them and others from engaging in this type of unlawful conduct.

### CLAIM 4
### FIRST AMENDMENT VIOLATION, 42 U.S.C. § 1983—H.C.O. § 509.04 IS UNCONSTITUTIONAL AS APPLIED
### (BY PLAINTIFF STACY HINNERS AGAINST DEFENDANT CITY OF HURON AND AGAINST DEFENDANT O'SHEA, IN HIS INDIVIDUAL AND OFFICIAL CAPACITIES)

283.    Plaintiff incorporates all previous allegations.

---

[98] *Novak v. City of Parma*, 932 F.3d 421, 433 (6th Cir. 2019) (citing *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963)) ("Novak also plausibly alleges that the officers created a prior restraint with their press release threatening to take legal action.").

284.    H.C.O. § 509.04 cannot be constitutionally applied to Mrs. Hinners's speech. Mrs. Hinners's speech was protected by the First and Fourteenth Amendments, as any reasonable observer would know.

285.    No substantial or compelling governmental interest exists for criminally punishing Mrs. Hinners for her speech.

286.    No governmental interest in proscribing Mrs. Hinners's speech outweighs her First Amendment right to make it.

### CLAIM 5
### FIRST AMENDMENT VIOLATION, 42 U.S.C. § 1983—H.C.O. § 525.07 IS UNCONSTITUTIONAL AS APPLIED
### (BY PLAINTIFF STACY HINNERS AGAINST DEFENDANT CITY OF HURON AND AGAINST DEFENDANT O'SHEA, IN HIS INDIVIDUAL AND OFFICIAL CAPACITIES)

287.    Plaintiff incorporates all previous allegations.

288.    H.C.O. § 525.07 cannot be constitutionally applied to Mrs. Hinners's refusal to speak to the police. That decision was protected by the First and Fourteenth Amendments, as any reasonable observer would know.

289.    No substantial or compelling governmental interest exists for criminally punishing Mrs. Hinners for that decision.

290.    No governmental interest in proscribing that decision outweighs Mrs. Hinners's First Amendment right to make it.

### CLAIM 6
### FIFTH AMENDMENT VIOLATION, 42 U.S.C. § 1983—H.C.O. § 525.07 IS UNCONSTITUTIONAL AS APPLIED
### (BY PLAINTIFF STACY HINNERS AGAINST DEFENDANT CITY OF HURON AND AGAINST DEFENDANT O'SHEA, IN HIS INDIVIDUAL AND OFFICIAL CAPACITIES)

291.    Plaintiff incorporates all previous allegations.

292.     H.C.O. § 525.07 cannot be constitutionally applied to Mrs. Hinners's refusal to speak to the police. That decision was protected by the Fifth and Fourteenth Amendments, as any reasonable observer would know.

293.     No substantial or compelling governmental interest exists for criminally punishing Mrs. Hinners for that decision.

294.     No governmental interest in proscribing that decision outweighs Mrs. Hinners's Fifth Amendment right to make it.

### Claim 7
### First Amendment violation, 42 U.S.C. § 1983—H.C.O. § 509.04 Is Void for Vagueness (By Plaintiff Jason Hinners against Defendant City of Huron and against Defendant O'Shea, in his individual and official capacities)

295.     Plaintiff incorporates all previous allegations.

296.     H.C.O. § 509.04 is a criminal ordinance. It provides that "No person, with purpose to prevent or disrupt a lawful meeting, procession or gathering, shall do either of the following: (1) Do any act which obstructs or interferes with the due conduct of such meeting, procession or gathering; (2) Make any utterance, gesture or display which outrages the sensibilities of the group."

297.     Whoever violates H.C.O. § 509.04 is guilty of "disturbing a lawful meeting," a misdemeanor of the fourth degree. Violations are punishable by up to 30 days in jail and a fine of up to $250.

298.     To avoid prosecutions in violation of the First Amendment, the Ohio Supreme Court has limited the reach of such laws to actions that cause a "substantial" disruption of the meeting in question.

299.     The Sixth District Court of Appeals, which would have jurisdiction over an appeal of Mrs. Hinners's case, has held that this limitation applies to a state statute identical to H.C.O. § 509.04.[99]

---

[99] *Toledo v. Thompson-Bean*, 173 Ohio App. 3d 566, 2007-Ohio-4898, 879 N.E. 2d 799, ¶ 21 ("Only conduct that 'effectively impairs, interferes with or obstructs the due conduct of the meeting in a major, consequential, significant or considerable manner' is prohibited.").

300.    Mr. Hinners wishes to engage in conduct substantially similar to that which his wife engaged in on May 14, 2019. He is unwilling to do so because he cannot discern the extent to which such conduct is forbidden under H.C.O. § 509.04.

301.    In both the criminal case and in this civil action, the City, through Mr. O'Shea, maintains that these First Amendment principles do not apply to his prosecution,

302.    If the City is correct, H.C.O. § 509.04 is unconstitutionally vague. As written, it fails to give a person of ordinary intelligence fair notice that her conduct is forbidden. As written, it authorizes and encourages arbitrary and discriminatory enforcement, and impermissibly delegates basic policy matters to police, judges, and juries for resolution on an *ad hoc* and subjective basis.

303.    No ordinary person would understand that the ordinance imposes criminal sanctions on speakers at a city council's public-comment session for speaking from their seats, facing the audience, or exceeding their time limit by less than one minute.

304.    No ordinary person would understand what utterances, gestures, or displays are sufficiently outrageous to expose them to criminal sanctions.

305.    Outrageousness is a highly malleable standard with an inherent subjectiveness about it which would allow a jury to impose liability on the basis of the jurors' tastes or views, or on the basis of their dislike of a particular expression. In public debate, we must tolerate outrageous speech to provide adequate breathing space to the freedoms protected by the First Amendment.

### CLAIM 8
### FIRST AMENDMENT VIOLATION, 42 U.S.C. § 1983— H.C.O. § 509.04 IS OVERBROAD (BY PLAINTIFF JASON HINNERS AGAINST DEFENDANT CITY OF HURON AND AGAINST DEFENDANT O'SHEA, IN HIS INDIVIDUAL AND OFFICIAL CAPACITIES)

306.    Plaintiff incorporates all previous allegations.

307.    If the City is correct that the Ohio Supreme Court's "substantiality" requirement does not apply to H.C.O. § 509.04, the ordinance is overbroad. As written, it reaches a substantial amount of constitutionally protected conduct.

308. The ordinance permits criminal sanctions against speakers at the public-comment session of Huron City Council meetings for any expressive conduct that obstructs or interferes with the meeting in any way, no matter how inconsequential the obstruction or interference.

309. The First Amendment protects expressive conduct that causes a *de minimis* interference with the meeting.

310. The ordinance permits criminal sanctions against speakers at the public-comment session of Huron City Council meetings if they do not face the mayor. The First Amendment would protect a speaker's decision to turn his back on the mayor to express opposition to the mayor's policies.

311. The ordinance permits criminal sanctions against speakers at the public-comment session of Huron City Council meetings if they exceed the time limit by less than a minute. The First Amendment would protect a speech that exceeded a stated time limit in a way that did not substantially impair the meeting.

312. The ordinance permits criminal sanctions against speakers at the public-comment session of Huron City Council meetings if they outrage others at the meeting. The First Amendment would protect a speech that audience members found outrageous.

313. Plaintiff Jason Hinners is unable to engage in activity that is protected by the First Amendment because the City's position permits the prosecution of *de minimis* disruptions of city council meetings.

314. The City has no policy in place that would prevent a prosecution based on *de minimis* disruptions such as applauding or booing.

### CLAIM 9
### FIRST AMENDMENT DEPRIVATION, 42 U.S.C. § 1983—ESTABLISHMENT CLAUSE
### (BY PLAINTIFFS STACY AND JASON HINNERS AGAINST DEFENDANT CITY OF HURON AND AGAINST DEFENDANT GINESI, IN HIS INDIVIDUAL CAPACITY)

315. Plaintiffs incorporate all previous allegations.

316.    Social justice is a central tenet of the Roman Catholic Church: "Fraud and other subterfuges … must be firmly condemned because they are incompatible with the requirements of justice. Much care should be taken to promote institutions that improve the conditions of human life."[100]

317.    Under the Establishment Clause, the Catholic Church is free to adopt this position.

318.    Under the Establishment Clause, the Catholic Church is free to elevate members to the clergy without interference from the government.

319.    At all relevant times, Defendant Ginesi was a policymaker of the City of Huron.

320.    Defendant Ginesi's participation in the Retaliation Campaign—by attempting to coerce the Church into redefining "non-Christian" behavior and into excluding Mr. Hinners from the clergy— had the predominant purpose and intended effect of establishing religious practices consistent with Council's preference to discourage citizen oversight of its activities, and it threatens to create excessive entanglement between the state and religion by inviting government officials to participate in formulating doctrine and selecting clergy.

321.    Attempting to coerce a church into redefining "non-Christian" behavior and excluding a member from the clergy poses a danger of divisive political activity and threatens a progression toward establishment of a state religion.

322.    Defendant Ginesi's actions interfered with the clearly established right of the Church, and of Mr. and Mrs. Hinners, as members of the Church, to be free from the establishment of state religion.

323.    Defendant Ginesi's actions—on behalf of the City—violated Mr. and Mrs. Hinners's clearly established constitutional and statutory rights, and were unlawful in light of clearly established law. No reasonable person would have believed otherwise, given the state of the law and Defendants' motivations.

---

[100] Catholic Church, *Article 2, Participation in Social Life*, in the Catechism of the Catholic Church (2012).

324.    As a direct and proximate result of Defendants' unlawful activity, Mr. and Mrs. Hinners have suffered and continue to suffer economic and non-economic damages for which Defendants are liable.

325.    Defendants' acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter them and others from engaging in this type of unlawful conduct.

## CLAIM 10
### FIRST AMENDMENT RETALIATION, 42 U.S.C. § 1983—FREE EXERCISE CLAUSE
### (BY PLAINTIFFS STACY AND JASON HINNERS AGAINST DEFENDANT CITY OF HURON AND AGAINST DEFENDANT GINESI, IN HIS INDIVIDUAL CAPACITY)

326.    Plaintiffs incorporate all previous allegations.

327.    Under the Free Exercise Clause, Mr. and Mrs. Hinners are free to condemn "fraud and other subterfuges" perpetuated by Council, and Mr. Hinners is free to pursue a position in the clergy.

328.    The Retaliation Campaign interfered with Mr. and Mrs. Hinners's rights to believe and profess whatever religious doctrine they desired by seeking to compel them to affirm contrary beliefs that were more deferential to the government, by punishing their expression of the doctrine they believed to be true, and by lending the government's power to the other side of a religious debate over how obedient Christians should be to their government.

329.    The Retaliation Campaign exposed Mr. and Mrs. Hinners to sanctions that would deter a person of ordinary firmness from continuing to engage in protected conduct.

330.    The Retaliation Campaign was developed in response to Mr. and Mrs. Hinners engaging in conduct protected under the Free Exercise clause.

331.    Defendants' actions—on behalf of the City—violated Mr. and Mrs. Hinners's clearly established constitutional and statutory rights, and were unlawful in light of clearly established law. No reasonable person would have believed otherwise, given the state of the law and Defendants' motivations.

332.     As a direct and proximate result of Defendants' unlawful activity, Mr. and Mrs. Hinners have suffered and continue to suffer economic and non-economic damages for which Defendants are liable.

333.     Defendants' acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter them and others from engaging in this type of unlawful conduct.

**CLAIM 11**
**FIRST AMENDMENT RETALIATION, 42 U.S.C. § 1983—FREE SPEECH CLAUSE**
**(BY PLAINTIFFS STACY AND JASON HINNERS AGAINST DEFENDANT CITY OF HURON; AGAINST DEFENDANTS HARTUNG, WHITE, LANE, GINESI, AND SCHAFFTER, IN THEIR INDIVIDUAL CAPACITIES; AND AGAINST DEFENDANTS HARDY, LIPPERT, ORZECH, KOEHLER, AND O'SHEA, IN THEIR INDIVIDUAL AND OFFICIAL CAPACITIES)**

334.     Plaintiffs incorporate all previous allegations.

335.     Under the Free Speech Clause, Mr. and Mrs. Hinners are free to gather and share information about the City's affairs.

336.     The Retaliation Campaign interfered with and was in retaliation for Mr. and Mrs. Hinners's exercise of their rights to speak freely on matters of public concern by punishing them for posting news to The Talk of Huron, filing lawsuits against the City, fulfilling their social-justice obligations, and attending and speaking at City Council meetings..

337.     The Retaliation Campaign exposed Mr. and Mrs. Hinners to sanctions that would deter a person of ordinary firmness from continuing to engage in protected conduct.

338.     The Retaliation Campaign was motivated by Mr. and Mrs. Hinners engaging in conduct protected under the Free Speech clause.

339.     Defendants' actions violated Mr. and Mrs. Hinners's clearly established constitutional and statutory rights, and were unlawful in light of clearly established law. No reasonable person would have believed otherwise, given the state of the law and Defendants' motivations.

340.     As a direct and proximate result of Defendants' unlawful activity, Mr. and Mrs. Hinners have

suffered and continue to suffer economic and non-economic damages for which Defendants are

liable.

341.     Defendants' acts were willful, egregious, malicious, and worthy of substantial sanction to

punish and deter them and others from engaging in this type of unlawful conduct.

### CLAIM 12
### FIRST AMENDMENT RETALIATION, 42 U.S.C. § 1983—FREE PRESS CLAUSE
### (BY PLAINTIFFS STACY AND JASON HINNERS AGAINST DEFENDANT CITY OF HURON; AGAINST DEFENDANTS HARTUNG, WHITE, LANE, GINESI, AND SCHAFFTER, IN THEIR INDIVIDUAL CAPACITIES; AND AGAINST DEFENDANTS HARDY, LIPPERT, ORZECH, KOEHLER, AND O'SHEA, IN THEIR INDIVIDUAL AND OFFICIAL CAPACITIES)

342.     Plaintiffs incorporate all previous allegations.

343.     Under the Free Press Clause, Mr. and Mrs. Hinners are free to publish information about the

City's affairs.

344.     The Retaliation Campaign interfered with and was in retaliation for Mr. and Mrs. Hinners

exercising their rights to post to The Talk of Huron.

345.     The Retaliation Campaign exposed Mr. and Mrs. Hinners to sanctions that would deter a

person of ordinary firmness from continuing to engage in protected conduct.

346.     The Retaliation Campaign was motivated by Mr. and Mrs. Hinners's conduct protected

under the Free Press clause.

347.     Defendants' actions violated Mr. and Mrs. Hinners's clearly established constitutional and

statutory rights, and were unlawful in light of clearly established law. No reasonable person would

have believed otherwise, given the state of the law and Defendants' motivations.

348.     As a direct and proximate result of Defendants' unlawful activity, Mr. and Mrs. Hinners have

suffered and continue to suffer economic and non-economic damages for which Defendants are

liable.

349.    Defendants' acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter them and others from engaging in this type of unlawful conduct.

**CLAIM 13**
**FIRST AMENDMENT RETALIATION, 42 U.S.C. § 1983—ASSEMBLY CLAUSE**
**(BY PLAINTIFFS STACY AND JASON HINNERS AGAINST DEFENDANT CITY OF HURON; AGAINST DEFENDANTS HARTUNG, WHITE, LANE, GINESI, AND SCHAFFTER, IN THEIR INDIVIDUAL CAPACITIES; AND AGAINST DEFENDANTS HARDY, LIPPERT, ORZECH, KOEHLER, AND O'SHEA, IN THEIR INDIVIDUAL AND OFFICIAL CAPACITIES)**

350.    Plaintiffs incorporate all previous allegations.

351.    Under the Assembly Clause, Mr. and Mrs. Hinners are free to join with like-minded people to advance their lawful interests.

352.    The Retaliation Campaign interfered with and was in retaliation for Mr. and Mrs. Hinners's exercise of their rights to assemble with others who believe in the importance of speaking out against injustice, and to assemble with neighbors at City Council meetings to share and receive information about the City's affairs.

353.    The Retaliation Campaign exposed Mr. and Mrs. Hinners to sanctions that would deter a person of ordinary firmness from continuing to engage in protected conduct.

354.    The Retaliation Campaign was motivated by Mr. and Mrs. Hinners's conduct protected under the Assembly clause.

355.    Defendants' actions violated Mr. and Mrs. Hinners's clearly established constitutional and statutory rights, and were unlawful in light of clearly established law. No reasonable person would have believed otherwise, given the state of the law and Defendants' motivations.

356.    As a direct and proximate result of Defendants' unlawful activity, Mr. and Mrs. Hinners have suffered and continue to suffer economic and non-economic damages for which Defendants are liable.

357.    Defendants' acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter them and others from engaging in this type of unlawful conduct.

### CLAIM 14
### FIRST AMENDMENT RETALIATION, 42 U.S.C. § 1983—PETITION CLAUSE
### (BY PLAINTIFFS STACY AND JASON HINNERS AGAINST DEFENDANT CITY OF HURON; AGAINST DEFENDANTS HARTUNG, WHITE, LANE, GINESI, AND SCHAFFTER, IN THEIR INDIVIDUAL CAPACITIES; AND AGAINST DEFENDANTS HARDY, LIPPERT, ORZECH, KOEHLER, AND O'SHEA, IN THEIR INDIVIDUAL AND OFFICIAL CAPACITIES)

358.    Plaintiffs incorporate all previous allegations.

359.    Under the Petition Clause, Mr. and Mrs. Hinners are free to ask their locally elected representatives to correct their mistakes and take other actions.

360.    The Retaliation Campaign interfered with and was in retaliation for Mr. and Mrs. Hinners's exercise of their right to petition the government by asking it to release records that it has not made public, by filing lawsuits against the City, and by speaking at City Council meetings.

361.    The Retaliation Campaign exposed Mr. and Mrs. Hinners to sanctions that would deter a person of ordinary firmness from continuing to engage in protected conduct.

362.    The Retaliation Campaign was motivated by Mr. and Mrs. Hinners's conduct protected under the Petition clause.

363.    Defendants' actions violated Mr. and Mrs. Hinners's clearly established First and Fourteenth Amendment rights.

364.    Defendants' acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter them and others from engaging in this type of unlawful conduct.

### CLAIM 15
### FOURTH AMENDMENT VIOLATION, 42 U.S.C. § 1983—MALICIOUS PROSECUTION
### (BY PLAINTIFF STACY HINNERS AGAINST DEFENDANT CITY OF HURON; AGAINST DEFENDANTS HARTUNG, WHITE, LANE, GINESI, AND SCHAFFTER, IN THEIR INDIVIDUAL CAPACITIES; AND AGAINST DEFENDANTS HARDY, LIPPERT, ORZECH, KOEHLER, AND O'SHEA, IN THEIR INDIVIDUAL AND OFFICIAL CAPACITIES)

365.    Plaintiffs incorporate all previous allegations.

366.    Mrs. Hinners was criminally prosecuted for engaging in activities protected under the First, Fifth, and Fourteenth Amendments.

367.     Defendants maliciously prosecuted and continued to prosecute Mrs. Hinners in the absence of probable cause.

368.     Defendants made, influenced, or participated in the decision to prosecute Mrs. Hinners, including by entering into an agreement to intimidate her, reporting her to the police, ordering her seizure, falsifying evidence, and by drafting and submitting misleading reports and affidavits.

369.     There was no probable cause for the criminal prosecution of Mrs. Hinners.

370.     Mrs. Hinners suffered a deprivation of her liberty and irreparable harm.

371.     Her prosecution resolved in her favor with the dismissal of all charges.

372.     Defendants' actions violated Mrs. Hinners's clearly established constitutional and statutory rights, and were unlawful in light of clearly established law. No reasonable person would have believed otherwise, given the state of the law and Defendants' motivations.

373.     As a direct and proximate result of Defendants' unlawful activity, Mrs. Hinners has suffered and continues to suffer economic and non-economic damages for which Defendants are liable.

374.     Defendants' acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter them and others from engaging in this type of unlawful conduct.

### CLAIM 16
### FOURTH AMENDMENT DEPRIVATION, 42 U.S.C. § 1983—EXCESSIVE FORCE
### (BY PLAINTIFF STACY HINNERS AGAINST DEFENDANT CITY OF HURON, AND AGAINST DEFENDANTS ORZECH AND KOEHLER IN THEIR INDIVIDUAL AND OFFICIAL CAPACITIES)

375.     Plaintiffs incorporate all previous allegations.

376.     There was no basis for removing Mrs. Hinners from the City Council meeting, and therefore no need to use any force against her.

377.     When they threw Mrs. Hinners into a wall, Defendants Orzech and Koehler did not reasonably perceive any need to use force against her, did not make reasonable efforts to temper or limit the force they used, and did not reasonably perceive Mrs. Hinners as a security threat. Mrs. Hinners did not threaten the officers and was not actively resisting.

378.    The force used by Defendants Orzech and Koehler in seizing Mrs. Hinners was objectively unreasonable in light of the facts and circumstances of their encounter.

379.    Defendants' actions violated Mrs. Hinners's clearly established constitutional and statutory rights, and were unlawful in light of clearly established law. No reasonable person would have believed otherwise, given the state of the law and Defendants' motivations.

380.    As a direct and proximate result of Defendants' unlawful activity, Mrs. Hinners has suffered and continues to suffer economic and non-economic damages for which Defendants are liable.

381.    Defendants' acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter them and others from engaging in this type of unlawful conduct.

### CLAIM 17
### FOURTH AMENDMENT VIOLATION, 42 U.S.C. § 1983—FALSE ARREST
### (BY PLAINTIFF STACY HINNERS AGAINST DEFENDANT CITY OF HURON, AND AGAINST DEFENDANTS HARTUNG, WHITE, AND LANE IN THEIR INDIVIDUAL CAPACITIES; AND AGAINST DEFENDANTS LIPPERT, ORZECH, AND KOEHLER, IN THEIR INDIVIDUAL AND OFFICIAL CAPACITIES)

382.    Plaintiffs incorporate all previous allegations.

383.    Defendants seized Mrs. Hinners based solely on her exercise of her clearly established First, Fifth, and Fourteenth Amendment rights.

384.    No officer could have reasonably believed there to be probable cause to seize Mrs. Hinners.

385.    Defendants' actions violated Mrs. Hinners's clearly established constitutional and statutory rights, and were unlawful in light of clearly established law. No reasonable person would have believed otherwise, given the state of the law and Defendants' motivations.

386.    As a direct and proximate result of Defendants' unlawful activity, Mrs. Hinners has suffered and continues to suffer economic and non-economic damages for which Defendants are liable.

387.    Defendants' acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter them and others from engaging in this type of unlawful conduct.

## CLAIM 18
### EQUAL PROTECTION VIOLATION, 42 U.S.C. § 1983—FAILURE TO INTERVENE
### (BY PLAINTIFFS STACY AND JASON HINNERS AGAINST DEFENDANTS HARTUNG, WHITE, LANE, GINESI, AND SCHAFFTER, IN THEIR INDIVIDUAL CAPACITIES; AND AGAINST DEFENDANTS HARDY, LIPPERT, ORZECH, AND KOEHLER, IN THEIR INDIVIDUAL AND OFFICIAL CAPACITIES)

388.    Plaintiffs incorporate all previous allegations.

389.    From the time Defendant Hartung began interfering with Mrs. Hinners's speech, into her seizure and removal from the meeting, through her prosecution, and continuing now through the City's insistence that it may resurrect charges against her, Defendants had reason to know that Mrs. Hinners was being subjected to constitutional violations, including First Amendment retaliation, the use of excessive force, and false arrest.

390.    At any time, Defendants could have interceded to stop the offending officials.

391.    At no time did any of the Defendants intercede to stop any offending officials.

392.    Defendants' actions violated Mrs. Hinners's clearly established constitutional and statutory rights, and were unlawful in light of clearly established law. No reasonable person would have believed otherwise, given the state of the law and Defendants' motivations.

393.    As a direct and proximate result of Defendants' unlawful activity, Mr. and Mrs. Hinners have suffered and continue to suffer economic and non-economic damages for which Defendants are liable.

394.    Defendants' acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter them and others from engaging in this type of unlawful conduct.

## CLAIM 19
### CIVIL CONSPIRACY, 42 U.S.C. § 1983
### (BY PLAINTIFFS STACY AND JASON HINNERS AGAINST DEFENDANT CITY OF HURON; AGAINST DEFENDANTS HARTUNG, WHITE, LANE, GINESI, AND SCHAFFTER, IN THEIR INDIVIDUAL CAPACITIES; AND AGAINST DEFENDANTS HARDY, LIPPERT, ORZECH, KOEHLER, AND O'SHEA, IN THEIR INDIVIDUAL AND OFFICIAL CAPACITIES)

395.    Plaintiffs incorporate all previous allegations.

396.    The Retaliation Campaign was the result of a single plan to retaliate against Mr. and Mrs. Hinners for engaging in First Amendment–protected activities.

397.    Defendants shared in the objectives of that plan.

398.    Defendants carried out overt acts, including the Retaliation Campaign, in furtherance of their plan.

399.    Defendants' actions violated Mr. and Mrs. Hinners's clearly established constitutional and statutory rights, and were unlawful in light of clearly established law. No reasonable person would have believed otherwise, given the state of the law and Defendants' motivations.

400.    As a direct and proximate result of Defendants' unlawful activity, Mr. and Mrs. Hinners have suffered and continue to suffer economic and non-economic damages for which Defendants are liable.

401.    Defendants' acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter them and others from engaging in this type of unlawful conduct.

### CLAIM 20
### MUNICIPAL LIABILITY, 42 U.S.C. § 1983—AUTHORIZED ACTION
### (BY PLAINTIFFS STACY AND JASON HINNERS AGAINST DEFENDANT CITY OF HURON)

402.    Plaintiffs incorporate all previous allegations.

403.    "A single unconstitutional act or decision, when taken by an authorized decisionmaker, may be considered a policy and thus subject a county to liability."[101]

404.    Defendants—all of whom except Orzech and Koehler were policymakers—established a policy of pursuing the Retaliation Campaign to discourage Mr. and Mrs. Hinners from exercising their constitutional and statutory rights.

---

[101] *Bible Believers v. Wayne Cty.*, 805 F.3d 228, 260–61 (6th Cir. 2015) (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986)) (holding county liable where county corporation counsel directed and authorized police officers to threaten arrest for protected speech because audience might react adversely, because corporation counsel "possesse[d] final authority to establish municipal policy.").

405.     Defendants Lane, White, and Lippert's actions in approving Defendant Hartung's decision to seize, detain, interrogate, charge, and set in motion to the prosecution of Mrs. Hinners.

406.     Defendant Lane's direction of Defendant O'Shea's prosecution was not limited to providing mere "legal advice," but instead instructed O'Shea to act in accordance with the policy Defendants established regarding the subject matter.

407.     Defendants White and Lippert were authorized to issue and implement official policy for police officers interacting with members of the public and exercising their discretion to protect First Amendment rights.

408.     Defendant Lane delegated (albeit improperly) criminal-justice-policymaking authority regarding Mrs. Hinners to Defendant O'Shea.

409.     By directing Chief Lippert to have Mrs. Hinners removed from the meeting and charged with crimes, Defendant White instructed him to act in accordance with the policy he established on those subjects.

410.     Defendant Lippert was authorized to issue and implement official policy for police officers interacting with members of the public and exercising their discretion to protect First, Fourth, and Fifth Amendment rights.

411.     By directing Officers Orzech and Koehler to remove Mrs. Hinners from the meeting and charge her with crimes, Defendant Lippert instructed them to act in accordance with the policy he established on those subjects.

412.     No reasonable officer or attorney could believe that the actions Defendants took were permitted by the Constitution.

413.     Defendants' actions violated Mr. and Mrs. Hinners's clearly established constitutional and statutory rights, and were unlawful in light of clearly established law. No reasonable person would have believed otherwise, given the state of the law and Defendants' motivations.

414.    As a direct and proximate result of Defendants' unlawful activity, Mr. and Mrs. Hinners have suffered and continue to suffer economic and non-economic damages for which Defendants are liable.

415.    The City is liable under the First, Fourth, Fifth, and Fourteenth Amendments via 42 U.S.C. § 1983.

**CLAIM 21**
**MUNICIPAL LIABILITY, 42 U.S.C. § 1983—UNCONSTITUTIONAL POLICY**
**(BY PLAINTIFFS STACY AND JASON HINNERS AGAINST DEFENDANT CITY OF HURON)**

416.    Plaintiffs incorporate all previous allegations.

417.    Through its officers' agreement to embark on the Retaliation Campaign and through Council's ratification of the prosecution of Mrs. Hinners, the City authorized and implemented an unconstitutional policy of pursuing the Retaliation Campaign, including Defendants' authorization and implementation of an unconstitutional custom, policy, or practice of refusing to distinguish between protected and unprotected speech in criminal prosecutions.

418.    Defendants also authorized or implemented an unconstitutional policy of authorizing and instructing criminal investigation and prosecution for speech in the absence of any rational basis for restricting it and in retaliation for activities protected under the First and Fourteenth Amendments.

419.    Defendants also authorized and implemented an unconstitutional policy of seeking criminal sanctions on the basis of perceived offenses to the dignity of members of City Council.

420.    Defendant Lane was authorized to set official policy for the City on these issues.

421.    Defendants' actions violated Mr. and Mrs. Hinners's clearly established constitutional and statutory rights, and were unlawful in light of clearly established law. No reasonable person would have believed otherwise, given the state of the law and Defendants' motivations.

422.     As a direct and proximate result of Defendants' unlawful activity, Mr. and Mrs. Hinners have suffered and continue to suffer economic and non-economic damages for which Defendants are liable.

423.     The City is liable under First, Fourth, Fifth, and Fourteenth Amendments via 42 U.S.C. § 1983.

**CLAIM 22**
**MUNICIPAL LIABILITY, 42 U.S.C. § 1983—FAILURE TO TRAIN/SUPERVISE**
**(BY PLAINTIFFS STACY AND JASON HINNERS AGAINST DEFENDANT CITY OF HURON)**

424.     Plaintiffs incorporate all previous allegations.

425.     "[A] city can be liable under § 1983 for inadequate training of its employees." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1969).

426.     The City failed to provide adequate training to its officers on clearly established First, Fourth, Fifth, and Fourteenth Amendment rights, including basic distinctions between protected and unprotected speech.

427.     In light of clearly established law requiring government officials to tolerate criticism, the City's failure to train its employees and officers to recognize that the Retaliation Campaign was unconstitutional demonstrates deliberate indifference to the rights of persons they may encounter.

428.     Defendants' actions violated Mr. and Mrs. Hinners's clearly established constitutional and statutory rights, and were unlawful in light of clearly established law. No reasonable person would have believed otherwise, given the state of the law and Defendants' motivations.

429.     As a direct and proximate result of Defendants' unlawful activity, Mr. and Mrs. Hinners have suffered and continue to suffer economic and non-economic damages for which Defendants are liable.

430.     The City is liable under First, Fourth, Fifth, and Fourteenth Amendments via 42 U.S.C. § 1983.

CLAIM 23
CONSPIRACY TO VIOLATE CIVIL RIGHTS, 42 U.S.C. § 1985(3)
(BY PLAINTIFFS STACY AND JASON HINNERS AGAINST DEFENDANT CITY OF HURON; AGAINST
DEFENDANTS HARTUNG, WHITE, LANE, GINESI, AND SCHAFFTER, IN THEIR INDIVIDUAL
CAPACITIES; AGAINST DEFENDANTS HARDY, LIPPERT, ORZECH, KOEHLER, AND O'SHEA, IN
THEIR INDIVIDUAL AND OFFICIAL CAPACITIES; AND AGAINST DEFENDANT WALTER
HAVERFIELD)

431.    Plaintiffs incorporate all previous allegations.

432.    Defendants conspired with the purpose of depriving Mr. and Mrs. Hinners of the equal
protection of the law as they exercised their constitutional and statutory rights, with the purpose to
deprive them of equal privileges and immunities of the law, and with the purpose of preventing or
hindering state authorities from securing to all persons equal protection of the rights Mr. and Mrs.
Hinners sought to exercise.

433.    In reaching that agreement, Defendants were motivated by a discriminatory animus against
Mr. and Mrs. Hinners. That animus was targeted at Mr. and Mrs. Hinners individually, based on
their opposition to Defendants' political goals, and as family members intimately associated with
other people opposed to Defendants' political goals.

434.    Mr. and Mrs. Hinners's membership in classes of people opposed to Defendants' political
agenda—both through their marriage and through their association with the majority of Huron
voters whose opposition led to most Defendants' ouster—is protected by the First Amendment and
by 42 U.S.C. § 1985(3).[102]

---

[102] *Conklin v. Lovely*, 834 F.2d 543, 550 (6th Cir. 1987) (affirming denial of summary judgment where
jury could conclude "a conspiracy existed against plaintiff on account of her political views"); *Glasson
v. City of Louisville*, 518 F.2d 899, 912 (6th Cir. 1975) ("A more invidious classification than that
between persons who support government officials and their policies and those who are critical of
them is difficult to imagine."); *Cameron v. Brock*, 473 F.2d 608, 610 (6th Cir. 1973) (affirming Section
1985(3) verdict where jury found sheriff "conspired to deprive the appellee of his rights and the
purpose of the deprivation was to halt or discourage anti-Brock activity").

435.    Based on their agreement, Defendants took various acts in furtherance of their conspiracy, including the Retaliation Campaign.

436.    Defendants' actions violated Mr. and Mrs. Hinners's clearly established constitutional and statutory rights, and were unlawful in light of clearly established law. No reasonable person would have believed otherwise, given the state of the law and Defendants' motivations.

437.    As a direct and proximate result of Defendants' unlawful activity, Mr. and Mrs. Hinners have suffered and continue to suffer economic and non-economic damages for which Defendants are liable.

438.    Defendants' acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter them and others from engaging in this type of unlawful conduct.

### CLAIM 24
### SUPERVISORY LIABILITY, 42 U.S.C. § 1983
### (BY PLAINTIFFS STACY AND JASON HINNERS AGAINST DEFENDANTS HARTUNG, WHITE, LANE, GINESI, AND SCHAFFTER, IN THEIR INDIVIDUAL CAPACITIES; AND AGAINST DEFENDANTS HARDY, AND LIPPERT, IN THEIR INDIVIDUAL AND OFFICIAL CAPACITIES)

439.    Plaintiffs incorporate all previous allegations.

440.    Defendants Hartung, Hardy, Schaffter, and Ginesi played active roles in the Retaliatory Campaign, including their authorization of, approval of, or knowing acquiescence to the development of that campaign, the attempt to use Father McBeth to retaliate against Mr. and Mrs. Hinners, and the decision to seize, charge, and prosecute Mrs. Hinners in violation of her statutory and constitutional rights.

441.    Defendants Hartung, Hardy, Schaffter, and Ginesi failed to supervise, control, or train the other defendants to ensure they did not violate Mr. and Mrs. Hinners's statutory and constitutional rights. Instead, they encouraged and condoned their actions, including lodging complaints with Father McBeth, removing Mrs. Hinners from the meeting, charging her with disturbing a lawful meeting, and adding more charges against her.

442.    Defendant Lane played an active role in the Retaliatory Campaign, including her authorization of, approval of, or knowing acquiescence to the decision to seize, charge, and prosecute Mrs. Hinners in violation of her statutory and constitutional rights.

443.    Defendant Lane failed to supervise, control, or train the other defendants to ensure they did not violate Mr. and Mrs. Hinners's statutory and constitutional rights. Instead, she encouraged and condoned their actions, including removing Mrs. Hinners from the meeting, charging her with disturbing a lawful meeting, and adding more charges against her.

444.    Defendant White played an active role in the Retaliatory Campaign, including his authorization of, approval of, or knowing acquiescence to the decision to seize, charge, and prosecute Mrs. Hinners in violation of her statutory and constitutional rights.

445.    Defendant White failed to supervise, control, or train the other defendants to ensure they did not violate Mr. and Mrs. Hinners's statutory and constitutional rights. Instead, he encouraged and condoned their actions, including removing Mrs. Hinners from the meeting, charging her with disturbing a lawful meeting, and adding more charges against her.

446.    Defendant Lippert played an active role in the Retaliatory Campaign, including his authorization of, approval of, or knowing acquiescence to the decision to seize, charge, and prosecute Mrs. Hinners in violation of her statutory and constitutional rights.

447.    Defendant Lippert failed to supervise, control, or train the other defendants to ensure they did not violate Mr. and Mrs. Hinners's statutory and constitutional rights. Instead, he encouraged and condoned their actions, including removing Mrs. Hinners from the meeting, charging her with disturbing a lawful meeting, and adding more charges against her.

448.    Defendants' actions violated Mr. and Mrs. Hinners's clearly established constitutional and statutory rights, and were unlawful in light of clearly established law. No reasonable person would have believed otherwise, given the state of the law and Defendants' motivations.

449.    As a direct and proximate result of Defendants' unlawful activity, Mr. and Mrs. Hinners have suffered and continue to suffer economic and non-economic damages for which Defendants are liable.

450.    Defendants' acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter them and others from engaging in this type of unlawful conduct.

### CLAIM 25
### INTENTIONAL TORT—ASSAULT
### (BY PLAINTIFF STACY HINNERS AGAINST DEFENDANTS ORZECH AND KOEHLER, IN THEIR INDIVIDUAL AND OFFICIAL CAPACITIES)

451.    Plaintiffs incorporate all previous allegations.

452.    Defendants Orzech and Koehler's intentional actions caused Mrs. Hinners reasonable apprehension of an immediate harmful or offensive contact.

453.    As a direct and proximate result of Defendant's unlawful activity, Mrs. Hinners has suffered and continues to suffer economic and non-economic damages for which Defendants are liable.

454.    Defendants' acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter them and others from engaging in this type of unlawful conduct.

### CLAIM 26
### INTENTIONAL TORT—BATTERY
### (BY PLAINTIFF STACY HINNERS AGAINST DEFENDANTS ORZECH AND KOEHLER, IN THEIR INDIVIDUAL AND OFFICIAL CAPACITIES)

455.    Plaintiffs incorporate all previous allegations.

456.    Defendants Orzech and Koehler's intentional actions caused harmful or offensive contact to Mrs. Hinners without her consent.

457.    As a direct and proximate result of Defendants' unlawful activity, Mrs. Hinners has suffered and continues to suffer economic and non-economic damages for which Defendants are liable.

458.    Defendant's acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter Defendant and others from engaging in this type of unlawful conduct.

## CLAIM 27
### INTENTIONAL TORT—FALSE IMPRISONMENT
**(BY PLAINTIFF STACY HINNERS AGAINST DEFENDANTS ORZECH AND KOEHLER, IN THEIR INDIVIDUAL AND OFFICIAL CAPACITIES)**

459.     Plaintiffs incorporate all previous allegations.

460.     Defendants Orzech and Koehler's intentional confinement of Mrs. Hinners to a limited area was without lawful privilege and against her consent.

461.     As a direct and proximate result of Defendants' unlawful activity, Mrs. Hinners has suffered and continues to suffer economic and non-economic damages for which Defendants are liable.

462.     Defendant's acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter Defendant and others from engaging in this type of unlawful conduct.

## CLAIM 28
### CIVIL CONSPIRACY
**(BY PLAINTIFFS STACY AND JASON HINNERS AGAINST DEFENDANT CITY OF HURON; AGAINST DEFENDANTS HARTUNG, WHITE, LANE, GINESI, AND SCHAFFTER, IN THEIR INDIVIDUAL CAPACITIES; AGAINST DEFENDANTS HARDY, LIPPERT, ORZECH, KOEHLER, AND O'SHEA, IN THEIR INDIVIDUAL AND OFFICIAL CAPACITIES; AND DEFENDANT WALTER HAVERFIELD)**

463.     Plaintiffs incorporate all previous allegations.

464.     The Retaliation Campaign involved and relied on two or more people, including each of the individual defendants.

465.     The participants in the Retaliation Campaign had a common understanding or design to commit acts that are unlawful.

466.     The participants in the Retaliation Campaign engaged in numerous independent unlawful acts, in particular the interference with the constitutional and statutory rights of Mr. and Mrs. Hinners.

467.     As a direct and proximate result of Defendants' unlawful activity, Mr. and Mrs. Hinners have suffered and continue to suffer economic and non-economic damages for which Defendants are liable.

468.　Defendants' acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter them and others from engaging in this type of unlawful conduct.

**CLAIM 29**
**NEGLIGENT AND RECKLESS HIRING/RETENTION/SUPERVISION**
**(BY PLAINTIFFS STACY AND JASON HINNERS AGAINST DEFENDANT CITY OF HURON; AGAINST DEFENDANT LANE, IN HER INDIVIDUAL CAPACITY; AND AGAINST DEFENDANT WALTER HAVERFIELD)**

469.　Plaintiffs incorporate all previous allegations.

470.　Defendant Lane participated in or acquiesced to the other Defendants' retaliation against Mr. and Mrs. Hinners.

471.　Defendant Lane was employed by the City and by Defendant Walter Haverfield.

472.　Defendant Lane was not competent to serve as an attorney in a role where she would have an obligation to support and uphold the Constitution, particularly with respect to its obligations to "to protect persons exercising the constitutional right of expression."

473.　Defendant Lane knew, for example, that City officials were targeting Mr. and Mrs. Hinners because of their involvement in First Amendment–protected activity, but made no effort to stop them.

474.　The City and Defendant Walter Haverfield knew or should have known that Defendant Lane was not competent to perform her duties.

475.　The City and Defendant Walter Haverfield hired and retained Lane and failed to supervise her despite their knowledge that she was facilitating retaliation against Mr. and Mrs. Hinners.

476.　The City and Defendant Walter Haverfield's failure to control or terminate Defendant Lane permitted her to inflict and prolong injuries Mr. and Mrs. Hinners suffered as a result of the Retaliation Campaign.

477.    As a direct and proximate result of the City's and Defendant Walter Haverfield's reckless hiring, retention, and supervision of Defendant Lane, Mr. and Mrs. Hinners have suffered and continue to suffer economic and non-economic damages for which Defendants are liable.

478.    Defendant O'Shea participated in or acquiesced to the other Defendants' retaliation against Mr. and Mrs. Hinners.

479.    Defendant O'Shea was employed by the City and by Defendants Lane and Walter Haverfield.

480.    Defendant O'Shea was not competent to act as a prosecutor, particularly with respect to his duty to act "a minister of justice and not simply that of an advocate." He was also incompetent on First Amendment and equal-protection issues.

481.    A competent prosecutor would have recognized the retaliatory nature of the charges against Mrs. Hinners and dropped them immediately.

482.    The City and Defendants Lane and Walter Haverfield knew or should have known that Defendant O'Shea was not competent to perform his duties.

483.    The City and Defendants Lane and Walter Haverfield hired and retained O'Shea and failed to supervise him despite their knowledge that he was facilitating retaliation against Mr. and Mrs. Hinners.

484.    The City's and Defendants Lane and Walter Haverfield's failure to control or terminate Defendant O'Shea permitted him to inflict and prolong injuries Mr. and Mrs. Hinners suffered as a result of the Retaliation Campaign.

485.    As a direct and proximate result of the City's and Defendants Walter Haverfield and Lane's negligent hiring, retention, and supervision of O'Shea, and, Mr. and Mrs. Hinners have suffered and continue to suffer economic and non-economic damages for which Defendants are liable.

486.    Defendants' acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter them and others from engaging in this type of unlawful conduct.

## CLAIM 30
### SPOLIATION
### (BY PLAINTIFF STACY HINNERS AGAINST DEFENDANTS CITY OF HURON AND AGAINST DEFENDANTS LIPPERT AND ORZECH, IN THEIR INDIVIDUAL AND OFFICIAL CAPACITIES)

487.    Plaintiffs incorporate all previous allegations.

488.    Litigation involving Mrs. Hinners was probable as soon as the City and its policymakers decided to pursue charges against her.

489.    Defendants City of Huron, Lippert, and Orzech knew even before Mrs. Hinners was charged that litigation was probable.

490.    Shortly after filing charges against Mrs. Hinners, Defendants City of Huron, Lippert, and Orzech willfully destroyed text messages reflecting how they made decisions regarding the charges against Mrs. Hinners.

491.    Defendants City of Huron, Lippert, and Orzech destroyed that evidence to disrupt Mrs. Hinners's ability to defend herself against the criminal charges they brought against her.

492.    The destruction of that evidence disrupted Mrs. Hinners's ability to secure a dismissal with prejudice of her criminal charges.

493.    Defendants City of Huron, Lippert, and Orzech destroyed that evidence to disrupt Mrs. Hinners's ability to hold them civilly liable for interfering with her civil rights.

494.    The destruction of that evidence has disrupted and will further disrupt Mrs. Hinners's ability to secure a civil judgment against Defendants.

## CLAIM 31
### RECORDS DESTRUCTION, OHIO REV. CODE § 149.351
### (BY PLAINTIFFS STACY AND JASON HINNERS AGAINST DEFENDANT CITY OF HURON AND AGAINST DEFENDANTS LIPPERT AND ORZECH, IN THEIR INDIVIDUAL AND OFFICIAL CAPACITIES)

495.    Plaintiffs incorporate all previous allegations.

496.     Under Ohio Rev. Code § 149.351, government records may not be removed, destroyed, mutilated, transferred, or otherwise damaged or disposed of except under a records-retention schedule approved by the city records commission, the state auditor, and the Ohio History Connection.

497.     Any person aggrieved by a violation or threatened violation of that prohibition may commence civil actions for injunctive relief to compel compliance to obtain reasonable attorneys' fees, and recover a forfeiture for each violation.

498.     To facilitate the Retaliation Campaign, Defendants Lippert, Orzech, and Koehler destroyed records related to the Retaliation Campaign.

499.     The City allowed its employees to destroy records related to the decision to pursue the Retaliation Campaign.

500.     The destruction of those records was not permitted by the City's records-retention schedule.

501.     Mr. and Mrs. Hinners are aggrieved by the destruction of those records.

### CLAIM 32
### CIVIL LIABILITY FOR CRIMINAL ACTS, OHIO REV. CODE § 2307.60
### (BY PLAINTIFFS STACY AND JASON HINNERS AGAINST DEFENDANTS HARTUNG, WHITE, LANE, GINESI, AND SCHAFFTER, IN THEIR INDIVIDUAL CAPACITIES; AND AGAINST DEFENDANTS HARDY, LIPPERT, ORZECH, KOEHLER, AND O'SHEA, IN THEIR INDIVIDUAL AND OFFICIAL CAPACITIES)

502.     Plaintiffs incorporate all previous allegations.

503.     Under Ohio Rev. Code § 2307.60 (A)(1), "Anyone injured in person or property by a criminal act has, and may recover full damages in, a civil action," including attorneys' fees and punitive damages.

504.     Defendants' agreement to enter and their conduct in executing the Retaliation Campaign constituted criminal acts, including violations of:

      a.     Conspiracy against rights (18 U.S.C. § 241);

b.      Deprivation of rights under color of law (18 U.S.C. § 242);

c.      Fraud by wire, radio, or television (18 U.S.C. § 1343);

d.      Kidnapping (Ohio Rev. Code § 2905.01);

e.      Abduction (Ohio Rev. Code § 2905.02);

f.      Unlawful restraint (Ohio Rev. Code § 2905.03);

g.      Coercion (Ohio Rev. Code § 2905.12);

h.      Telecommunications fraud (Ohio Rev. Code § 2913.05);

i.      Tampering with records (Ohio Rev. Code § 2913.42);

j.      Disorderly conduct (Ohio Rev. Code § 2917.11);

k.      Inducing panic (Ohio Rev. Code § 2917.32);

l.      Making false alarms (Ohio Rev. Code § 2917.32);

m.      Intimidation (Ohio Rev. Code § 2921.03);

n.      Intimidation of attorney, victim or witness (Ohio Rev. Code § 2921.04);

o.      Retaliation (Ohio Rev. Code § 2921.05);

p.      Tampering with evidence (Ohio Rev. Code § 2921.12);

q.      Falsification (Ohio Rev. Code § 2921.13);

r.      Obstructing official business (Ohio Rev. Code § 2921.31);

s.      Obstructing justice (Ohio Rev. Code § 2921.32);

t.      Dereliction of duty (Ohio Rev. Code § 2921.44);

u.      Interfering with civil rights (Ohio Rev. Code § 2921.45);

v.      Conspiracy (Ohio Rev. Code § 2923.01);

w.      Attempt to commit an offense (Ohio Rev. Code § 2923.02); and

x.      Complicity (Ohio Rev. Code § 2923.03)

505.    As a direct and proximate result of Defendants' unlawful activity, Mr. and Mrs. Hinners have suffered and continue to suffer economic and non-economic damages for which Defendants are liable.

506.    Defendants' acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter them and others from engaging in this type of unlawful conduct.

### CLAIM 33
### INTIMIDATION, OHIO REV. CODE § 2921.03
### (BY PLAINTIFF STACY HINNERS AGAINST DEFENDANTS HARTUNG, WHITE, GINESI, AND SCHAFFTER, IN THEIR INDIVIDUAL CAPACITIES; AND AGAINST DEFENDANTS HARDY, AND IN THEIR INDIVIDUAL AND OFFICIAL CAPACITIES)

507.    Plaintiffs incorporate all previous allegations.

508.    No person, knowingly and by force, by unlawful threat of harm to any person or property, or by filing, recording, or otherwise using a materially false or fraudulent writing with malicious purpose, in bad faith, or in a wanton or reckless manner, shall attempt to influence, intimidate, or hinder a public servant, party official, or witness in the discharge of the person's duty.

509.    Defendants Hartung, White, Schaffter, Ginesi, and Hardy filed, recorded, or otherwise used materially false or fraudulent writings when they drafted their statements for use in the prosecution of Mrs. Hinners.

510.    Those writings were an attempt to influence, intimidate, or hinder public servants and witnesses, including Defendants Lippert and O'Shea, Mrs. Hinners, and the trial judge in the discharge of their duties.

511.    As a direct and proximate result of Defendants' unlawful activity, Mr. and Mrs. Hinners have suffered and continue to suffer economic and non-economic damages for which Defendants are liable.

512.    Defendants' acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter them and others from engaging in this type of unlawful conduct.

## PRAYER FOR RELIEF

Mr. and Mrs. Hinners therefore respectfully request the following relief from the Court:

A.  Enter judgment in their favor on all claims for relief;

B.  Declare that Defendants' acts and conduct constitute violations of the First, Fourth, Fifth, and Fourteenth Amendments to the United States Constitution, as well as violations of 42 U.S.C. §§ 1983 and 1985(3).

C.  Declare that none of Plaintiffs' actions violated H.C.O. § 509.04, H.C.O. § 525.07, H.C.O. § 525.09, or Ohio Rev. Code § 2921.32.

D.  Declare that H.C.O. § 509.04, H.C.O. § 525.07 and H.C.O. § 525.09, and Ohio Rev. Code § 2921.32 are unconstitutional.

E.  Award injunctive relief barring further prosecution of Mrs. Hinners.

F.  Award injunctive relief barring Defendants from perpetrating further unlawful acts such as the ones that injured Mrs. Hinners;

G.  Award injunctive relief enjoining Defendants from further unlawful application of Ohio law;

H.  Declare that Defendants are liable for damages on all claims brought against them.

I.  Award full compensatory damages including, but not limited to, damages for pain and suffering, mental anguish, emotional distress, that Mr. and Mrs. Hinners have suffered and are reasonably certain to suffer in the future;

J.  Award punitive and exemplary damages for the individual Defendants' egregious, willful, and malicious conduct;

K.  Award Mr. and Mrs. Hinners $1,000 per violation of Ohio Rev. Code § 149.351(A) for the destruction of records they requested;

L.  Award pre- and post-judgment interest at the highest lawful rate;

M.  Award reasonable attorneys' fees and all other costs of suit available under 42 U.S.C. § 1988, and Ohio Rev. Code §§ 149.351, 2307.60, 2921.03; and otherwise available with punitive damages; and

N.  Award all other relief in law or equity, including injunctive relief, that the Court deems equitable, just, and proper.

## JURY DEMAND

Mr. and Mrs. Hinners demand a trial by jury on all issues within this complaint.

March 25, 2020

Respectfully submitted,

THE CHANDRA LAW FIRM LLC

*/s/ Brian D. Bardwell*
Subodh Chandra (0069233)
Brian D. Bardwell (0098423)
The Chandra Law Building
1265 W. 6th St., Ste. 400
Cleveland, Ohio 44113
216.578.1700 Phone
216.578.1800 Fax
Subodh.Chandra@ChandraLaw.com
Brian.Bardwell@ChandraLaw.com

*Attorneys for Plaintiffs Stacy and Jason Hinners*